**CASE NOT YET SCHEDULED FOR ORAL ARGUMENT**

**In the United States Court of Appeals
For the District of Columbia Circuit**

Public.Resource.Org, Inc. *et al,*

> *Petitioners,*

> *v.*                                        No. 23-1311

Federal Communications Commission, *et al,*

> *Respondents.*

**BRIEF OF PETITIONERS**

**On Petition to Review an Order of**

**The Federal Communications Commission**

Alan B. Morrison
George Washington University
  Law School
2000 H Street NW
Washington D.C. 20052
(202) 994 7120
abmorrison@law.gwu.edu


David Halperin
1805 9th St NW
Washington, DC 20001
(202) 905-3434
davidhalperindc@gmail.com

March 27, 2024                          Counsel for Petitioners

## CERTIFICATE AS TO PARTIES, RULINGS, & RELATED CASES

**Parties:** The only parties are petitioners Public.Resource.Org, Inc., iFixit, Inc., Make: Community, LLC, and the respondents Federal Communications Commission (FCC) and the United States. There were no parties to the proceeding before the FCC, and as of this date, there are no amici or intervenors in this Court.

**Ruling Below:**    The only ruling below is the September 29, 2023, decision of the FCC which was published at 88 Fed. Reg. 67108–16. JA 1–35.

**Related Cases:**  There are no related cases.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, petitioners hereby state that petitioner Public.Resource.Org, Inc. is a 501(c)(3) non-profit corporation, petitioner iFixit, Inc. is a for-profit corporation, and petitioner Make: Community is an LLC.  None of the petitioners is a publicly held corporation, and none of them has any parent corporations.

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS, & RELATED CASES**.................................. i

**TABLE OF AUTHORITIES** ............................................................................. iii

**INTRODUCTION**.................................................................................. 1

**JURISDICTION** ................................................................................... 2

**ISSUES PRESENTED** ............................................................................ 3

**RELEVANT STATUTES AND RULES** .................................................... 3

**STATEMENT OF THE CASE** ................................................................. 4

    **Statutory Background**………………………………………………….4

    **Proceedings Before the FCC**…………………………………………….7

        **The Proposed Rules**…………………………………………………….7

        **Petitioners' Comments**………………………………………………10

        **The Final Rules** ………………………………………………….......12

.

**SUMMARY OF ARGUMENT** ............................................................... 15

**ARGUMENT** ....................................................................................... 18

  I.   **THE FCC VIOLATED 5 U.S.C. § 553(b) BY APPROVING THESE RULES WITHOUT PUBLISHING THEIR TEXT IN THE FEDERAL REGISTER**.......... 18

    **IBR's Secrecy Is Incompatible with Section 553(b)**……………….………………20

    **Circuit Case Law Strongly Supports Petitioners**……………………………….28

    **Copyright Law Cannot Rescue IBR from Section 553(b)**………………………….32

  II.  **THE FCC VIOLATED 5 U.S.C. § 552(a)(1)(D) BY FAILING TO PUBLISH THE FINAL RULES IN THE FEDERAL REGISTER**. .................................. 344

**CONCLUSION** .................................................................................... 35

**ADDENDUM**

    **Federal Register Notice of Proposed Rulemaking**…..………………………1a

    **Abstract for IEEE/ANSI C63.10-2020** ………………………………… 12a

# TABLE OF AUTHORITIES

## Cases

*American Coke & Coal Chemicals Institute v. EPA*, 452 F.3d 930
(D.C. Cir. 2006) ............................................................... 30, 31

*American Medical Association v. Reno*, 57 F.3d 1129 (D.C. Cir. 1995) ......... 20, 22

*American Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 27
(D.C. Cir. 2007) ............................................................... 29, 30

*American Society for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th
1262 (D.C. Cir. 2023) ......................................................... 6, 12, 33, 34

*Banks v. Manchester*, 128 U.S. 244 (1888) ............................................... 32

*Environmental Integrity Project v. EPA,* 425 F.3d 992 (D.C. Cir. 2005) .............. 31

*Georgia v. Public.Resource.Org, Inc.,* 140 S. Ct. 1498 (2020) .............................. 33

*International Union, United Mine Workers of America v. Mine Safety and Health
Admin.*, 407 F.3d 1250 (D.C. Cir. 2005) ............................................... 31

*Kooritzky v. Reich*, 17 F.3d 1509 (D.C. Cir. 1994) ..................................... 30

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) ............................ 31

*Portland Cement Association v. Ruckelshaus,* 486 F.2d 375 (D.C. Cir. 1973) ....... 29

*Veeck v. Southern Bldg. Code Congress International, Inc.*, 293 F.3d 791 (5th Cir.
2002) ......................................................................... 32

*Wheaton v. Peters*, 33 U.S. 591 (1834) ................................................. 32

## Statutes

28 U.S.C. § 2342 ......................................................................................2

47 U.S.C. § 402 .......................................................................................2

5 U.S.C. § 552 ........................................... 2, 3, 4, 6, 15, 18, 23, 24, 35, 36

5 U.S.C. § 553 ............................................ 1, 2, 3, 4, 10, 12, 15, 18, 19, 36

## Other Authorities

Administrative Conference of the United States, *Incorporation by Reference* (Dec. 8, 2011), https://www.acus.gov/document/incorporation-reference ......5, 6, 25, 26

iFixIt, *Home*, www.iFixIt.com (last visited Mar. 23, 2024) ...................................28

Make:, *Home*, www.make.co (last visited Mar. 23, 2024) ......................................28

Public.Resource.Org, *Global Public Safety Codes*, INTERNET ARCHIVE (Aug. 27, 2009), https://archive.org/details/publicsafetycode .............................................27

## Executive Materials

1 C.F.R. § 51.7 ......................................................................... 4, 6, 25

79 Fed. Reg. 66,267 .................................................................... 24, 25

87 Fed. Reg. 15,180 .................................................................... 7, 8, 9

88 Fed. Reg. 67,108 .......................................................... i, 2, 13, 15, 36

OFFICE OF MANAGEMENT AND BUDGET, CIRCULAR A-119, https://www.whitehouse.gov/wp-content/uploads/2020/07/revised_circular_a-119_as_of_1_22.pdf (rev. Jan. 27, 2016) ...............................................25

U.S. DEP'T OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT (1947) ...........................................................20

# INTRODUCTION

This is a straightforward case, with a minimal record and no factual disputes. Respondent Federal Communications Commission (FCC), acting pursuant to the notice and comment rulemaking provisions of 5 U.S.C. § 553(b), issued a notice of proposed rulemaking with respect to the four rules at issue in this case, but did not publish the rules in the Federal Register. Rather, using a procedure known as "Incorporation by Reference," the FCC informed the public that copies of the rules were available at its headquarters in Washington DC, which could be read but not copied. It also noted that copies of the proposed rules were available from the private organizations that originally published them. However, these too could not be copied nor reproduced in whole or in part, and they were available only after making a substantial payment to the sponsoring organization.

During the public comment period provided by the FCC for these rules, petitioners filed comments that objected to the agency's failure to comply with 5 U.S.C. § 553(b), on the ground that they were denied reasonable access to the proposed rules, which prevented them from submitting meaningful comments on those rules. However, the FCC rejected those objections and approved the rules as proposed, without making them generally available to petitioners and other members of the public. In addition, when the FCC approved these rules, it did not publish

them in the Federal Register as required by 5 U.S.C. § 552(a)(1)(D), nor did it publish them on its website or otherwise make them readily available to the public.

Instead, the FCC noted again that copies of the final rules would be available for inspection at the Commission's headquarters and also would be housed at the Office of the Federal Register (OFR). It further stated that copies of the rules could be purchased from the private organizations that published them and noted that "at least two" of the four standards were available, in a read-only format, in online "reading rooms" maintained by private organizations.

The sole issues in this case are whether the FCC acted lawfully when it failed to publish both the proposed and final rules as required by 5 U.S.C. § 553(b) and 5 U.S.C. § 552(a)(1)(D).

## JURISDICTION

Respondent FCC published the order under review in the Federal Register on September 29, 2023, at 88 Fed. Reg 67108. JA 1–35.  That order is reviewable in this Court pursuant to 47 U.S.C. § 402(a).  The petition to review was filed in this Court on November 8, 2023. This Court has jurisdiction under 28 U.S.C. § 2342(1).

## ISSUES PRESENTED

1. Did respondent FCC violate 5 U.S.C. § 553(b) by failing to make the text of the proposed rules at issue reasonably available so that petitioners and other interested members of the public could meaningfully comment on them?

2. Did respondent FCC violate 5 U.S.C. § 552(a)(1)(D) by failing to publish the text of these final rules in the Federal Register or on its website, or otherwise make them reasonably available to petitioners and the public?

## RELEVANT STATUTES AND RULES

5 U.S.C. § 552(a) provides in relevant part as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; . . .

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

5 U.S.C. § 553(b) provides as follows:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;
(2) reference to the legal authority under which the rule is proposed;
(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved;

1 C.F.R. § 51.7 provides in relevant part as follow:

(a) A publication is eligible for incorporation by reference under 5 U.S.C. 552(a) if it—

(3) Is reasonably available to and usable by the class of persons affected.


## STATEMENT OF THE CASE

### Statutory Background

There are two basic tenets of federal administrative law that the FCC violated in this case. First, all notices of proposed substantive rules under 5 U.S.C. § 553(b)—and no one claims that these rules are not substantive and hence not subject to subsection (b)—must be published in the Federal Register or otherwise made publicly available so that members of the public can learn what is in them and have the opportunity to submit meaningful comments on them. Second, under 5 U.S.C. § 552(a)(1)(D), when a federal rule becomes final, it must be published in the Federal Register or otherwise made publicly available so that members of the public can know what the law is, comply with it, and/or seek to change it. The FCC did not publish the text of either the proposed or the final rules, and what it did

instead fell woefully short of complying with either law. Hence, the FCC's order approving these rules cannot be sustained.

Given the clarity of these statutes, the long tradition of public participation in federal agency rulemaking, the principle that everyone is entitled to know the laws that govern them, and the ease of posting the rules on the FCC's website, the Court may wonder why the FCC did not comply with the law.  The answer is that each of these rules was initially published by a private standards development organization (SDO). SDOs convene panels of experts from industry, academia, and government to produce technical standards on a range of matters. The SDOs then publish the standards and sell their copyrighted publications to the public. SDOs regularly urge federal agencies to adopt their standards as binding law.  However, they claim that they would lose revenue if agencies published the texts of these standards as federal rules in the Federal Register. Based on that premise, the organizations ask—and many agencies, including the FCC, agree—not to publish the text, either at the proposed or final rule stage, as an accommodation to the organizations under a procedure known as "Incorporation by Reference" (IBR).  *See* Administrative Conference of the United States, *Incorporation by Reference* (2011), https://www.acus.gov/document/incorporation-reference.

The IBR procedure was initially developed to enable agencies to save the cost of publication of final agency rules in the physical volumes of the Federal Register

and the Code of Federal Regulations (CFR).  *Id.*  Congress recognized the desirability of reducing costs and decreasing clutter in the Federal Register and the CFR, and it codified the practice in the final paragraph of 5 U.S.C. § 552(a)(1).  That provision allows publication in the Federal Register of final rules to be satisfied if the rules are "reasonably available to the class of persons affected thereby . . . when incorporated by reference therein with the approval of the Director of the Federal Register."  *Id.*  The Director has issued a rule that makes a rule "eligible for incorporation by reference" if the rule is "reasonably available to and usable by the class of persons affected."  1 C.F.R. § 51.7(3).  The Director has not issued a rule defining when a rule is "reasonably available," and neither the IBR statute nor the IBR rule purports to exempt IBR rules from the notice and comment requirements of section 553(b).

There is one other aspect of the statutory background that bears on the potential applicability of the copyright laws to this case. In *American Society for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023), this Court held that industry standards, like those at issue here, that have been adopted by a government agency are subject to a fair use exception to the copyright laws.  Thus, once the FCC approved these rules, the fair use doctrine applies, and the FCC would have no defense to a Freedom of Information Act request to make the final rule available under 5 U.S.C. § 552. And a non-profit entity, such as Public

Resource, that obtained copies of the rules could not be barred by copyright laws from making them publicly available.

**Proceedings before the FCC**

*The Proposed Rules*

On March 17, 2022, the FCC published a Notice of Proposed Rulemaking for the four rules that are the subject of this petition to review. The official version of the NPRM, which the FCC provided for the Joint Appendix (JA 36–60), was adopted on January 24, 2022. It has consecutively numbered paragraphs, and it differs in other significant ways from the version that was published for interested persons in the Federal Register at 87 Fed. Reg. 15180. For the convenience of the Court, the Federal Register notice is attached in the Addendum to this brief (1a-11a).

The Federal Register notice, but not the official NPRM, contained the following thirty-six word "Summary" of the agency's proposal:

> In this document, the Federal Communications Commission (Commission) proposes targeted updates to its rules to incorporate new and updated standards that are integral to the testing of equipment and accreditation of laboratories that test RF devices.

*Id.* at 15180. The FCC then went on to describe each of the proposed rules generally, including that the sponsoring organization for most of them had specifically requested that the FCC adopt them as official FCC rules. The FCC in its official NPRM, *see* JA 49, ¶ 36, formally granted the petitions of two SDOs to have their

7

standards adopted by the agency, but that paragraph was not included the Federal Register NPRM.

As part of the FCC's solicitation of comments, the agency posed a number of questions, which can only be answered by examining each specific proposal. For example, with respect to one proposal that the agency indicated its intent to adopt in its entirety, it nonetheless asked

> whether any procedures or techniques included in ANSI C63.25.1—2018 would not be appropriate for use in the context of demonstrating compliance with the Commission's equipment authorization rules. *Commenters in this regard should provide details of their concerns and specifically cite any rule sections for which the new standard may be problematic.*

JA 41 (emphasis added). The agency then noted that, because it was proposing to adopt the standard as a compliance option, "we tentatively conclude that there is no need to designate a transition period. We seek comment on these tentative conclusions." JA 42.

For another new standard which it proposed in place of the existing standard, the Commission posed this question to would-be commenters:

> Are there any procedures or techniques included in ANSI C63.10—2020 that would not be appropriate for use in the context of demonstrating compliance with the Commission's equipment authorization rules? *Commenters in this regard should provide details of their concerns and specifically cite any rule sections for which the new standard may be problematic.* emphasis added); JA 43.

The FCC also asked about a transition for this proposed rule, including "what time period would be appropriate, and should it generally apply to all rules affected by the new reference?" JA 43.

As part of this package, the FCC included certain conforming amendments, and for them the agency had some questions regarding possible transition periods and for which it sought quite specific suggestions:

> Commenters with concerns related to updating any of these references should specifically cite any rule sections for which the updated standard may be problematic or portions of ISO/IEC 17011:2017(E) that should be excluded from the updated incorporation by reference and provide alternatives or a detailed explanation of their concerns.

JA 43.

Because the FCC was using Incorporation by Reference, it did not publish the proposed rules in the Federal Register. Its Federal Register notice recognized the requirement that the proposals be reasonably available, and for each standard it provided information along these lines:

> Interested persons may purchase a copy of ANSI C63.25.1 from the sources provided in 47 FR 2.910. A copy of the standard may also be inspected at the FCC's main office.

87 Fed. Reg. at 15186. This language, contained within two longer paragraphs, is not included in the official NPRM, and hence the quoted paragraph is not in the JA but is in the Addendum at 7a. What the quoted language did not explain, and is undisputed, is that the price of that particular 268-page standard in hard copy is $681,

that even a purchaser cannot copy or reproduce any part of its contents, and that an "inspection" at the FCC's headquarters is also on a read-only basis.

### Petitioners' Comments

In response to the FCC's notice of proposed rulemaking, petitioners submitted joint comments on April 12, 2022. *See* JA 61–74. Those comments identified each petitioner and stated its interest in the rulemaking:

> Public Resource is a 501(c)(3) nonprofit organization based in California. Its mission is to make the law more readily available. iFixit is a collaborative effort spanning thousands of fixers, repair-seekers, and translators dedicated to assisting people in repairing their equipment. Make Community is an organization that has been elevating makers, nurturing a global cultural movement, and celebrating creativity, innovation and curiosity since 2005.

JA 63.

Petitioners did not comment on the substance of the proposed rules because, as they pointed out, the rules were not published in the Federal Register or otherwise reasonably available as required by 5 U.S.C. § 553. *See* JA 64. They also explained why it is not only unlawful for the FCC not to publish the text of the proposed rules in the Federal Register, but why it was important that the public have reasonable access to proposed rules if the procedures under section 533 were to work as intended. *See* JA 64–65.

Petitioners' submission detailed the costs of purchasing each of the standards online—ranging from $63 to $175 for electronic versions—each of which has very

substantial restrictions on use that make it very difficult if not impossible to respond to the detailed questions that the FCC asked or otherwise comment meaningfully on the proposed rules.  *See* JA 65–68. These restrictions leave no doubt that if anyone sought to make effective use of the standards to submit comments to the FCC in this rulemaking, they would certainly be sued for copyright infringement by an entity with the ability and incentives to carry out their threat.

Petitioners also detailed the inadequacies of public access to the proposed rules that the SDOs had provided by means of their "free" online "reading rooms." JA 69–70.  Only some of the proposed rules were available in these reading rooms, and for those that were, they were offered only with onerous and troubling restrictions. Users are required to accept all cookies on the website, install special software, and provide extensive registration information, including an address, telephone number, and name of employer.  Once registered, the user must accept an end user license agreement which requires the user to accept the alleged validity of copyrights on the texts and warns the user not to copy, distribute, republish, or modify the texts.  The user must also agree that the private SDO could terminate access to the proposed rules "at any time and for any reason." JA 69.  These SDOs also bar users from cutting and pasting or printing text—a limitation that made it

difficult to analyze the standards' provisions or prepare comments to submit to the FCC.[1]

Petitioners set forth the summary of section 553 demonstrating that, when standards like these become law in the form of final agency rules, any copyright must take a backseat to the right of the public to know the law. In their conclusion, they made it clear what the FCC had to do: The FCC must "restart this rulemaking proceeding with everyone having free access and the right to copy these proposed standards, which is what 5 U.S.C. § 553 mandates." JA 74.[2]

### *The Final Rules*

But the FCC did not restart the rulemaking, instead approving the rules as proposed. The Commission defended its refusals by attempting to explain how the proposals were nonetheless reasonably available, despite the costs of purchasing copies from the sponsoring organizations, the impracticality of "inspecting" them at the FCC, the troubling terms of use in and barriers to access of the online reading

---

[1] This Court in *American Society for Testing & Materials v. Public.Resource.Org*, 82 F.4th 1262 (D.C. Cir. 2023), found that the reading rooms of the SDOs in that matter "do not provide equivalent or even convenient access to the incorporated standards. Among other things, text is not searchable, cannot be printed or downloaded, and cannot be magnified without becoming blurry. Often, a reader can view only a portion of each page at a time and, upon zooming in, must scroll from right to left to read a single line of text." *Id.* at 1270.

[2] In addition, petitioners noted that the limitations imposed by the online reading rooms render the documents inaccessible to the visually impaired, in violation of the Americans with Disabilities Act. *See* JA 70.

rooms, and the burdensome restrictions on their use in making comments if anyone obtained a copy of them.

Its official report (Report), approving the final rules, was released on March 14, 2023, and is set forth at JA 1–29.  Its Erratum was released on September 15, 2023.  The Federal Register publication was issued on September 29, 2023.  *See* 88 Fed. Reg. at 67110.  The Federal Register appears to include the changes made by the Erratum, but it omits the 117 footnotes found in the body of the Report, as well as the 60 footnotes contained in the two Appendices to the Report.  The Report, like the NPRM, has numbered paragraphs, but the Federal Register notices do not. Other than stylistic changes (substituting "the Commission" for "we") and moving some sections around, the final rule in the Federal Register appears to be the same as the Report as modified by the Erratum.  None of these differences, nor those in the NPRM, was mentioned or justified in either version of these documents.

In the explanation of the final rule, the FCC dealt with petitioners' objections under the heading "Availability of Materials."  JA 3–6.  It discussed the benefits of IBR and recognized that standards that are being proposed to be incorporated by reference are "typically accompanied with limitations on how those standards are accessed due to the standard developers' intellectual property interests in those materials." JA 4, ¶ 8.  In response to petitioners' comments, the FCC raised no legal arguments, but contended that petitioners' proposal "would be inconsistent with

established government-wide guidance and practice for IBR" and suggested that following petitioners' position would make private standards unavailable, presumably because the organizations would withdraw their support. *Id.* ¶ 9. It further observed that "the Commission provided sources through which interested persons could obtain copies of the relevant standards and stated that a copy of each standard was available for inspection at the FCC's main office." *Id.* It concluded that the proposed rules were sufficiently available because it had

> communicat[ed] with the relevant standards bodies to encourage availability of materials in an online read-only format and, prior to publication of the NPRM in the Federal Register, confirmed that each standard was available for purchase by any interested party.
>
> . . .
>
> [A]t least two of these standards were available online in a read-only format without cost, abstracts and information related to the standards are widely available without restriction, and the Commission, per its longstanding practice, ensured that the materials were available for in-person inspection.

JA 4–5, ¶¶ 9–10. The FCC further stated, "we anticipate that all of the standards, once adopted, will be made available to the public through the on-line reading rooms that the standards bodies maintain." JA 5, ¶ 11. As to those who actually commented on the merits, the FCC wrote, no one "identified any impediments to finding and accessing the standards under consideration." JA 23, ¶ 4.

14

On that basis, the Commission concluded that "the materials proposed to be incorporated by reference have been made reasonably available to the class of person affected, consistent with 5 U.S.C. § 552(a) and the requirements and procedures under 1 CFR part 51."  JA 5, ¶ 10.  It further recognized the limitations that each access mechanism has and that they would not exist if petitioners' recommendations were adopted, but asserted that "none of these limitations would *prevent* interested parties from accessing and using the standards the Commission is adopting."  JA 6, ¶ 11 (emphasis added).  It then described how to obtain copies of each standard, mainly by purchase or at inspection at the FCC.  *Id.*  The agency also stated that the Director of the Federal Register had approved these rules for IBR.  JA 16.  At no point did the FCC explain how these rationales satisfied the notice and comment requirements of section 553(b).  And it also did not publish the final rules in the Federal Register, as required by 5 U.S.C. § 552(a)(1)(D), or even post them on its website.

The final rule was published on September 29, 2023, effective October 30, 2023.  The petition to review was timely filed in this Court on November 8, 2023.

## SUMMARY OF ARGUMENT

Incorporation by reference (IBR), when it deprives the public of meaningful access to the text of proposed rules, is fundamentally inconsistent with the requirement in 5 U.S.C. § 553(b) to afford the public notice and a meaningful

opportunity to comment on a proposed rule.  The proper standard is that relevant materials regarding a proposed rule, especially the actual text, must be reasonably available to interested persons so that they can submit meaningful comments to the agency.

Section 553(b) provides that publication in the Federal Register is the expected method for achieving that goal, and while other means may be acceptable, what the FCC did here is plainly not.  "Reasonably available" cannot mean having to go to the FCC headquarters in Washington DC, where the proposal could be "inspected" but not copied, and it surely does not mean paying hundreds of dollars for copies and then being forbidden to copy the contents, even for the purpose of commenting on the proposed rules.  Comments on technical rules like these require the ability to know and quote the relevant portions of the proposal, as confirmed by the specific questions that the FCC posed in its NPRM.

There are no applicable exemptions from this reasonable availability mandate, including the IBR statute.  That provision applies only to the publication of final rules, and in any event, it still directs agencies to assure that relevant matter is "reasonably available."  And, as the Office of the Federal Register provides in its regulation, the Director's approval of IBR for these rules does not relieve the FCC of its obligations to comply with all relevant laws, including section 553(b).

These conclusions are strongly reinforced by decades of cases from this Circuit applying section 553(b) to overturn agency proceedings in cases involving far less egregious departures from the core publication requirement at issue here. In those cases, agencies have been reversed for not making available all relevant data on which it relied, even when the text of the rule has been published, or where the final rule differs significantly from the published version. The key to those decisions is the need to assure "meaningful participation," which plainly cannot occur if the public is denied the text of the rule itself.

Nor can copyright law rescue the FCC or IBR. Section 553(b) does not contain an IBR or copyright exception, and there is not a word in the Copyright Act that could justify an exemption from publication. Indeed, the fair use exception in copyright law, and the constitutional rulings holding that law cannot be copyrighted, further support the conclusion that claims of copyright for proposed rules are inconsistent with section 553(b).

As for the FCC's failure to publish the text of its final rules, the OFR rule mandating reasonable availability of final rules, as well as section 552(a)(1)(D) itself, leave no doubt that the FCC has violated the final rule publication requirement. Moreover, the fair use and constitutional principles cited above have even more force once an agency has converted a proposal into a final rule.

## ARGUMENT

The petition to review alleges that the FCC has violated two separate provisions of law: 5 U.S.C. § 553(b), for failing to publish the text of these rules in the Federal Register as part of the notice and comment period; and 5 U.S.C. § 552(a)(1)(D), for failing to publish the final rule in the Federal Register. This brief will first demonstrate why section 553(b) was violated and then show that, even if the FCC did not have to include the text of these rules in its proposal, it still must publish the text of the final rules in the Federal Register or on its website.

## I.    THE FCC VIOLATED 5 U.S.C. § 553(b) BY APPROVING THESE RULES WITHOUT PUBLISHING THEIR TEXT IN THE FEDERAL REGISTER.

Since the 1970s, this Court has reviewed countless cases in which an agency's compliance with the notice and comment rulemaking requirements of 5 U.S.C. § 553(b) have been at issue.  Many of those cases have involved either the question of whether the agency's final rule differed so much from its proposal that it could no longer be considered a "logical outgrowth" of what was proposed, or whether the agency failed to include in the record supporting its proposal the important relevant evidence that the agency was planning to use to justify the final rule.  Petitioners have not found a case like this one in which the agency purported to comply with section 553(b) but never published its proposed rules in the Federal Register, as expressly required by that provision.  However, the rationales used to

18

decide section 553(b) cases in this Circuit and elsewhere all support the proposition that the text of all proposed rules must be made meaningfully available so that interested persons have the basic information needed to comment on the specifics of the proposal.

Before turning to the case law and the applicable regulations, there are two preliminary points to make.  Section 553(b) was enacted in 1946, decades before the advent of the Internet, which makes agency websites accessible from anywhere in the world.  Although section 553(b) requires publication in the Federal Register, petitioners would, as a practical matter, be satisfied if the FCC had posted these proposed rules on its website.

Second, section 553(b)(3) also allows an agency to publish the "substance of the proposed rule or a description of the subjects and issues involved" as an alternative to publishing the "terms" (text) of the proposed rules.   5 U.S.C. § 553(b)(3).   Based on the FCC's response to petitioners' comments regarding compliance with section 553(b), the FCC did not rely on that alternative to justify not publishing the text of rules in the Federal Register.  Moreover, given the evolution of section 553 and what this Court has held is required to satisfy its purposes, publishing the "substance" of these complex, highly technical rules, or "a description of the subjects and issues involved" would not satisfy what is required of all agencies under section 553(b).  Instead, the FCC's defense is that the proposed

rules were made "meaningfully available" because they could be inspected at the FCC or OFR headquarters in Washington DC, could be purchased from the sponsoring organizations, or could be viewed in an SDO online reading room, in all cases on a read-only basis.[3]

### *IBR's Secrecy Is Incompatible with Section 553(b)*

There are many decisions of this Court that describe the purposes behind the notice and comment rulemaking requirements, but the opinion of Chief Judge Wald in *American Medical Association v. Reno,* 57 F.3d 1129 (D.C. Cir. 1995), describes them precisely and succinctly:

> The APA requires an agency to provide notice of a proposed rule, an opportunity for comment, and a statement of the basis and purpose of the final rule adopted. 5 U.S.C. § 553(b)–(c) (1998). These requirements, which serve important purposes of agency accountability and reasoned decisionmaking, impose a significant duty on the agency. Notice of a proposed rule must include sufficient detail on its content and basis in law and evidence to allow for meaningful and informed comment.

*Id.* at 1132.

---

[3] The Attorney General's Manual on the Administrative Procedure Act (APA) was issued in 1947 and is considered to be an authoritative resource.  U.S. DEP'T OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT (1947) (the "Manual").   The Manual discussed the contents of the required notice under section 553(b), including the option of publishing only a "description of the subjects and issues involved" where "publication of a proposed rule in full would unduly burden the Federal Register or would in fact be less informative to the public," in which case the agency would still have to provide copies of the proposed rules "from the agency upon request."  Manual at 29.  There is no longer an issue of burden,  and there was no suggestion that the copies that the Manual required to be provided could not be retained and/or copied by the requester, which are the conditions imposed by the FCC here.

The FCC did not publish the texts of these rules, and its suggested options for obtaining them were wholly inadequate.  The first option was to travel to the FCC's headquarters, or the OFR, in Washington DC, where copies were available for "inspection," which means that petitioners could not have copied them for later reference and incorporation in their comments.  The second option was to purchase copies from the sponsoring organization, but nowhere does section 553 authorize "toll booth" availability.  Moreover, as petitioners explained in their comments to the FCC, even if someone were willing to pay the substantial prices that these private entities choose to charge, the purchase comes with very significant restrictions on their use.  Thus, according to the unrebutted comments submitted by petitioners, those restrictions would prevent a purchaser from copying portions of the proposed rules or including them in their comments to illustrate problems with, or ambiguities in, the proposed rules.  *See* JA 69–70.  That limitation is particularly significant in rules like these (and many others) that are highly technical and complex. The third option was to access some, though not all, of the rules through SDO online reading rooms, where terms of use and technical barriers aggressively invade a user's privacy and also limit the usability of the texts.

The FCC's notice of proposed rulemaking here demonstrates the importance of having access to the actual text and being able to quote portions of it in submitting comments.  On pages 8–9 *supra,* petitioners quoted a series of questions on which

the FCC sought comments, which could not have been answered without access to the text and the right to copy it in a comment. For one rule, the FCC requested that "Commenters in this regard should provide details of their concerns and specifically cite any rule sections for which the new standard may be problematic." JA 43. For another, it asked that

> Commenters with concerns related to updating any of these references should specifically cite any rule sections for which the updated standard may be problematic or portions of ISO/IEC 17011:2017(E) that should be excluded from the updated incorporation by reference and provide alternatives or a detailed explanation of their concerns.

*Id.* And a third inquired about a transition for another proposed rule, including "what time period would be appropriate, and should it generally apply to all rules affected by the new reference?" *Id.* Without access to the texts of these rules and the right to copy portions into a public comment, petitioners and other members of the public could not respond to the FCC's questions or otherwise comment meaningfully on the proposed rules. In the words of Judge Wald, the FCC did not make available to the public "sufficient detail on its content and basis in law and evidence to allow for meaningful and informed comment." 57 F.3d at 1132.

The FCC's responses in their explanation of the final rules, quoted *supra* at 12–15, boil down to "the public has legal access to the proposals and that is all that is required." The FCC ignores whether this access is easy or free, or equivalent to publication on its website or in the Federal Register. Nor does it seek to justify under

section 553(b) how it can lawfully impose the substantial costs incurred in either visiting FCC or OFR headquarters or paying the substantial fees chosen by the sponsoring entity, or how the read-only restrictions that apply even if a member of the public gained access to the proposed rules and wanted to comment on them satisfy section 553(b).  It simply concluded that very limited and expensive  access sufficed because "none of these limitations would *prevent* interested parties from accessing and using the standards the Commission is adopting."   JA 6, ¶ 11 (emphasis added).   The standard under section 553(b) is not whether an agency prevented members of the public from obtaining access to the text of proposed rules. Rather, the question is whether the FCC has fulfilled its statutory obligations to make the text of the proposed rules available and usable, at no more cost than viewing them on the agency's website, or obtaining a copy of the Federal Register. In light of the limited options available to the public here, it is plain that the FCC did not meet that standard for these rules.

In its defense, respondent is likely to cite the statute applicable to Incorporation by Reference (IBR), which is the final sentence in the separate paragraph at the end of 5 U.S.C. § 552(a)(1).  It provides:

> For the purpose of this paragraph, *matter reasonably available to the class of persons affected* thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

5 U.S.C. § 552(a)(1) (emphasis added).  The term "this paragraph" refers to the paragraph that requires publication of *final* rules in the Federal Register, and so it has no direct relevance to the main issue in this case, which is whether the FCC was required to publish the texts of these rules at the proposal stage.  Petitioners explain *infra* at 34-35 why this sentence does not help the FCC when it failed to publish the final rules, but for now we note that, even under the standard of this exception, the proposed rule must be "reasonably available to the class of persons affected thereby."  5 U.S.C. § 552(a)(1).  Because the public needs to be able to read the actual text, as well as copy any relevant portions, both when a rule is being proposed and when a final rule is in effect, the reasonably available standard should apply to both, as the many cases from this Circuit demonstrate.

The FCC may note that the Director of the Federal Register did approve IBR for these rules, but that fact has no bearing on the section 553(b) issue because the IBR statute only applies to final and not proposed rules.  Moreover, the Director has made it clear in the OFR's final IBR rules that their office has no role in determining whether materials are reasonably available.  *See* 79 Fed. Reg. 66267 (November 7, 2014).  In that rulemaking, the Director rejected a proposal that the Office should monitor agencies to be sure that the necessary materials continue to be reasonably available, *see id.* at 66268, because it is "the responsibility of the agency issuing the

regulations to ensure that it complies with the requirements of the APA," *id.* at 66276.

The Director's explanation made it clear that the Director cannot do "a substantive review of all preambles in rules where the agencies propose to IBR materials" because that would be "beyond our authority." *Id.* It also declined to define "reasonably available" or "make a case-by-case analysis of 'reasonable availability.' We must rely on the analysis of the agency." *Id.* And its final rule on eligibility for IBR supports petitioners by requiring that the rule "[i]s reasonably available and usable by the class of persons affected." 1 C.F.R. § 51.7(3). A proposed rule that cannot be copied can hardly qualify as "usable."[4]

The Administrative Conference of the United States (ACUS) studied IBRs but did not opine on the applicability of section 553(b) or the copyright law to them. It did, however, recognize certain serious problems with IBRs and urged agencies to find ways to reduce them. *See* Administrative Conference of the United States, *Incorporation         by         Reference*,         (Dec.         8,         2011),

---

[4] The Office of Management & Budget in its 2016 revision of Circular A-119 took a different view on the question of who is responsible for defining reasonable availability: "[I]t is not within the purview of the Circular to define reasonable availability. Rather, it is by statute the responsibility of the Office of the Federal Register (OFR) to address this issue." OFFICE OF MANAGEMENT AND BUDGET, CIRCULAR A-119, https://www.whitehouse.gov/wp-content/uploads/2020/07/revised_circular_a-119_as_of_1_22.pdf (rev. Jan. 27, 2016). But either way, neither office has even attempted to provide a definition that helps the FCC here.

https://www.acus.gov/document/incorporation-reference.    In Recommendation 1, ACUS suggested that "[a]gencies considering incorporating material by reference should ensure that the material will be reasonably available both to regulated and other interested parties." *Id.*  ACUS also urged agencies to consider, when deciding whether to use IBR, whether "access may be necessary during rulemaking to make public participation in the rulemaking process effective," and to assess the "cost to regulated and other interested parties to obtain a copy of the material, including the cumulative cost to obtain incorporated material that itself incorporates further materials." *Id.*  Those concerns support petitioners' position that IBR is inconsistent with section 553(b), as illustrated by this case.

SDOs have claimed in the past that standards like the ones incorporated in this rule are of no concern to ordinary people because they consist of highly technical materials only of interest to a few industry participants and professionals whose employers can well afford to buy expensive standards documents. According to that theory, because no one else is interested in these standards or would want to comment on them, the standards are reasonably available to and usable by the class of persons affected because the standards. But that is not the case.

Policy advocates, academics, journalists, small business operators, contractors, homeowners, government agency workers, and others are affected by the substance of technical standards incorporated into law. They need access to the

26

texts of these standards to analyze, explain, critique, and develop proposals to improve the law, to understand and comply with the law, and to enforce the law.

Take, for example, one of the standards at issue, ANSI/IEEE C63.10-2020, American National Standard of Procedures for Compliance Testing of Unlicensed Wireless Devices. The public available abstract, which is attached as an addendum to this brief (12a), describes the standard as including procedures for "testing the compliance of a wide variety of unlicensed wireless transmitters" including remote control devices, cordless telephones, medical unlicensed wireless devices, intrusion detectors, and automatic vehicle identification systems.

All three plaintiffs have both the technical competence to read and understand these standards and a compelling need to be able to communicate these laws to their fellow citizens. Public Resource provides a comprehensive repository of standards incorporated into law that enables interested person to search across all those standards without a charge. *See* Public.Resource.Org, *Global Public Safety Codes*, INTERNET ARCHIVE (Aug. 27, 2009), https://archive.org/details/publicsafetycode. Being able to search related building codes, fire codes, electrical codes, and other binding laws provides a transformative and extremely useful service to citizens. Likewise, iFixIt provides instructions to individuals and supports a community of users dedicated to fixing electronic devices that must conform to this standard. *See* iFixIt, *Home*, www.iFixIt.com (last visited Mar. 23, 2024). Finally, MAKE

27

Community LLC represents a community of tens of thousands of individuals who wish to create new and innovative devices from scratch that must conform with these binding legal regulations.  *See* Make:, *Home*, www.make.co (last visited Mar. 23, 2024).

The same principles are true for many other rules that were or will be kept secret by the current approach to IBR taken by the FCC and other agencies.  For these other standards, there will be individuals and organizations that wish to participate in the rulemaking process and others that need to know what the law is once the standards have been adopted by a federal agency.  There is no factual or legal basis for the SDOs' claim that everyone who *really* needs access to these standards already has them.

### Circuit Case Law Strongly Supports Petitioners

There are two lines of cases under section 553(b) that focus on different requirements that this Circuit has imposed to carry out the purposes of that provision and to assure that courts can meaningfully review rules that an agency has approved.  Indeed, in each of those cases, the agency had published a proposed rule, and the court nonetheless found that the agency had not provided enough information or data to comply with section 553.

We begin with Judge Leventhal's opinion in *Portland Cement Association v. Ruckelshaus,* 486 F.2d 375 (D.C. Cir. 1973).  In setting aside the rule at issue there,

the court stated that "[i]t is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency." *Id.* at 393.  As the court further observed: "Obviously a prerequisite to the ability to make meaningful comment is to know the basis upon which the rule is proposed." *Id.* at 393 n.67.  The court there was concerned with data and studies, but here the even more basic material—the texts of the proposed rules—was not reasonably available in a form that could be used by the public.

In a case involving this respondent, *American Radio Relay League, Inc. v. F.C.C.,* 524 F.3d 27 (D.C. Cir. 2007), this Court ruled that the agency violated the APA in part "by redacting studies on which it relied in promulgating the rule." *Id.* at 38.  As the Court further explained:

> It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment.

*Id.* at 44.  But at least there, the petitioner could read the unredacted studies if it located them, nor is there any suggestion that the petitioner could not copy them, in contrast to the barriers faced in this case.  In his concurrence, Judge Tatel further observed that "the Commission's failure to turn over the unredacted studies

undermines this court's ability to perform the review function APA section 706 demands." *Id.* at 49–50.[5]

The second line of cases involve those in which the agency's final rule differs significantly from what it proposed. The courts have recognized that final rules will often differ from what is proposed, in part because the purpose of the opportunity to submit comments is to educate the agency as to flaws in its approach and to make adjustments accordingly. *See Kooritzky v. Reich,* 17 F.3d 1509, 1513 (D.C. Cir. 1994). Thus, in *American Coke & Coal Chemicals Institute v. EPA,* 452 F.3d 930 (D.C. Cir. 2006), the court upheld the rule even though the limitation being challenged was more stringent than had been initially proposed because the limitation is calculated according to the announced procedure and thus was not '"surprisingly distant 'from the limitation presaged" in the notice of proposed rulemaking. *Id.* at 940. As the Supreme Court observed when discussing this doctrine, "[t]he object, in short, is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).

---

[5] Other cases making the same general point include *Engine Manufacturers Association v. EPA,* 20 F.3d 1177, 1181 (D.C. Cir. 1994); *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.,* 494 F.3d 188, 201 (D.C. Cir. 2007) (failure to timely disclose methodology used to derive key multipliers to determine driver fatigue); *Chamber of Commerce of the US v. SEC,* 443 F.3d 890, 906 (D.C. Cir. 2006) (fact that important material was publicly available did not excuse agency from not including it in rulemaking record).

However, this Court has insisted that the final rule be a "logical outgrowth" of what was proposed by the agency, and it has "refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." *Environmental Integrity Project v. EPA,* 425 F.3d 992, 996 (D.C. Cir. 2005). The Court there noted that the EPA's "final interpretation was also mentioned (albeit negatively) in the Agency's proposal," but that was not enough because "[w]hatever a 'logical outgrowth' of this proposal may include, it certainly does not include the Agency's decision to repudiate its proposed interpretation and adopt its inverse." *Id.* at 998. Not making a proposal public, as the FCC refused to do here, is surely no better than the surprise that the EPA inflicted in *Environmental Integrity Project.* Similarly, in *International Union, United Mine Workers of America v. Mine Safety and Health Admin,* 407 F.3d 1250 (D.C. Cir. 2005), this Court overturned a rule imposing a velocity cap of 500 feet per minute when the agency's proposal stated that it was not considering a cap, let alone one of that magnitude. Its opinion also referred to other cases involving the logical outgrowth issue. *Id.* at 1259–60. Accordingly, the many cases from this Circuit holding that the rulemaking record must be complete and that an agency cannot make a radical course change from proposed to final rule make petitioners' claim that the failure to make the text of a proposed rule reasonably available an *a fortiori* application of those decisions.

31

### *Copyright Law Cannot Rescue IBR from Section 553(b)*

The FCC did not defend its refusal to publish the proposed rules in the Federal Register on the ground that the sponsoring organizations claimed that publication would adversely affect their copyright to their standards which were being used under IBR. Had the FCC raised a copyright defense, it would have been unavailing for several reasons. First, there is no such exception to the notice and comment requirements of section 553(b), and there is no provision of the Copyright Act that purports to change the law on notice and comment rulemaking. Congress might try to create one, but it has not done so.

Second, as petitioners explained in their comments to the agency, *see* JA 72–74, the Supreme Court in *Wheaton v. Peters,* 33 U.S. 591 (1834), and *Banks v. Manchester,* 128 U.S. 244 (1888), held that the law "is in the public domain and thus not amenable to copyright." *Veeck v. Southern Bldg. Code Congress International, Inc.,* 293 F.3d 791, 796 (5th Cir. 2002) (en banc) (citing *Wheaton* and *Banks* as supporting that proposition), *cert. denied*, 539 U.S. 969 (2003). All three cases—*Wheaton*, *Banks*, and *Veeck*—concerned similar fact patterns: A private party, claiming copyright, was trying to stop another private party from publishing material that was part of the law, and the court in each case refused the plaintiff's request. More recently, the Supreme Court reaffirmed the almost 200-year-old principle that "no one can own the law" in *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498

(2020), in which the Court rejected a challenge brought by the State of Georgia against Public Resource for posting online the Official Code of Georgia, in which the state claimed copyright. *Id.* at 1507. Therefore, if the FCC had published these standards as proposed rules, and if the sponsoring organizations brought similar copyright claims against the FCC, they should fail for the same reasons.

The copyright holders in this situation might nonetheless argue that the result should be different because the proposals are not yet law. The response to that claimed distinction is found in the fair use exception to the copyright law, as most recently applied by this Court in *American Society for Testing & Materials v. Public.Resource.Org, Inc,* 82 F.4th 1262 (D.C. Cir. 2023) ("*ASTM"*). That case involved standards very similar to those at issue here, and it held that fair use gave Public Resource the right to copy and publish them once they had been adopted as law. *Id.* at 1272. Assuming that the copyright holders sued the FCC for publishing these standards as proposed rules, the agency would surely be in no worse position than a non-profit organization like Public Resource, and the use of the materials—to comply with the notice and comment requirements of section 552(b)—is on a par with the fair uses found protected in the *ASTM* case. Although the copyright question is not before this Court, it may be raised by the FCC or a potential amicus, and for that reason, petitioners preferred not to have to wait until their reply brief to respond to it.

This Court in *ASTM* also addressed the SDOs' argument that their organizations would face financial ruin and stop producing standards if those standards, once incorporated by reference, were readily available to the public. The Court noted, accurately, that SDOs "regularly update their standards," while regulatory agencies "are much less nimble in updating the incorporations." *Id.* at 1271. The result is that, usually, by the time that particular standards are incorporated by reference into law, they have been superseded as industry standards by a newer version, which is the version that tends to sell. This reality helps explain why, as this Court found, despite fifteen years of Public Resource posting incorporated standards, the SDO plaintiffs had been "unable to produce any economic analysis showing that Public Resource's activity has harmed any relevant market for their standards." *Id.* Petitioners do not believe that concerns about SDO revenues should inform this Court's judgments about whether the FCC made the texts of these regulations reasonably available. But even if such potential concerns were relevant, there is no evidence here that they are valid.

## II.    THE FCC VIOLATED 5 U.S.C. § 552(a)(1)(D) BY FAILING TO PUBLISH THE FINAL RULES IN THE FEDERAL REGISTER.

If petitioners prevail on their claim that section 553(b) required the FCC to publish the proposed rules, then the agency would have no defense to their claim that they were obligated under 5 U.S.C. § 552(a)(1)(D) to publish the identical final

rules. But even if the FCC were to prevail on the section 553(b) claim, its only defense to the latter claim would be that the rule's release pursuant to the IBR statute, set forth in the final paragraph of section 552(a)(1), satisfied the alternative to Federal Register publication requirement under which the rule must be "reasonably available to the class of persons affected thereby."

That argument would fail because the final rules here are no more reasonably available than were the proposed rules. Moreover, as to final rules, the *ASTM* decision and the other authorities cited above would preclude the FCC from refusing to make "the law" available, as required by section 552, because the copyright holder would be barred by fair use from preventing the FCC from carrying out its statutory obligation to publish all of its rules in the Federal Register (or on its website). Either way, the FCC has no defense to its failure to publish these final rules.

## CONCLUSION

For the foregoing reasons, the order of the respondent Federal Communications Commission dated September 29, 2023, approving the rules described at 88 Fed. Reg 67108–16, should be reversed, and the case remanded for further proceedings in compliance with 5 U.S.C. § 553(b) and 5 U.S.C. § 552(a)(1)(D), with directions that the rules remain in effect in the interim.

Alan B. Morrison
George Washington University
    Law School
2000 H Street NW
Washington D.C. 20052
(202) 994 7120
abmorrison@law.gwu.edu


David Halperin
1805 9th St NW
Washington, DC 20001
(202) 905-3434
davidhalperindc@gmail.com

Counsel for Petitioners

March 27, 2024

## I. Public Participation

*How do I prepare and submit comments?*

Your comments must be written in English. To ensure that your comments are correctly filed in the docket, please include the docket number of this document in your comments.

You may submit your comments via email to the email address listed above under **ADDRESSES**. Please include the docket number associated with this notice and the subject matter in the subject line of the email. Comments should be attached to the email as a Microsoft Word or text-searchable PDF document. Only non-confidential and public versions of confidential comments should be submitted by email.

*How do I submit confidential business information?*

The Commission will provide confidential treatment for identified confidential information to the extent allowed by law. If your comments contain confidential information, you must submit the following by email to the address listed above under **ADDRESSES**:

• A transmittal letter requesting confidential treatment that identifies the specific information in the comments for which protection is sought and demonstrates that the information is a trade secret or other confidential research, development, or commercial information.

• A confidential copy of your comments, consisting of the complete filing with a cover page marked "Confidential-Restricted," and the confidential material clearly marked on each page. You should submit the confidential copy to the Commission by mail.

• A public version of your comments with the confidential information excluded. The public version must state "Public Version—confidential materials excluded" on the cover page and on each affected page and must clearly indicate any information withheld. You may submit the public version to the Commission by email or mail.

*Will the Commission consider late comments?*

The Commission will consider all comments received before the close of business on the comment closing date indicated above under **DATES**. To the extent possible, we will also consider comments received after that date.

*How can I read comments submitted by other people?*

You may read the comments received by the Commission at the Commission's Electronic Reading Room or the Docket Activity Library at the addresses listed above under **ADDRESSES**.

## II. Discussion

On February 15, 2022, the Commission issued an Advance Notice of Proposed Rulemaking (ANPRM) on demurrage and detention billing requirements. 87 FR 8506. The ANPRM seeks comments on whether the Commission should require common carriers and marine terminal operators to include certain minimum information on or with demurrage and detention billings. Also, the Commission is interested in receiving comments on whether it should require common carriers and marine terminal operators to adhere to certain practices regarding the timing of demurrage and detention billings.

On March 3, 2022, the Commission received a letter, attached, signed by 44 associations requesting that the Commission extend the comment period by an additional 30 days. The associations stated that they "are in the process of surveying respective member companies to gather their experiences and document them in a manner that is most helpful to the FMC." The letter furthers says that the extension would facilitate the associations' efforts to collect information regarding the impact of demurrage and detention billing practices.

This notice grants the request for an extension of the 30-day comment period by an additional 30 days. The comment period now expires on April 16, 2022.

By the Commission.

**William Cody,**
*Secretary.*

[FR Doc. 2022–05572 Filed 3–16–22; 8:45 am]

**BILLING CODE 6730–02–P**

---

## FEDERAL COMMUNICATIONS COMMISSION

**47 CFR Parts 2, 15, 68, and 73**

**[ET Docket Nos. 21–363 and 19–48; FCC 22–3; FR ID 75329]**

**Updating References to Standards Related to the Commission's Equipment Authorization Program**

**AGENCY:** Federal Communications Commission.

**ACTION:** Proposed rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) proposes targeted updates to its rules to incorporate new and updated standards that are integral to the testing of equipment and accreditation of laboratories that test RF devices.

**DATES:** Comments are due on or before April 18, 2022. Reply comments are due on or before May 16, 2022. Written comments on the Paperwork Reduction Act proposed information collection requirements must be submitted by the public, Office of Management and Budget (OMB), and other interested parties on or before May 16, 2022.

**ADDRESSES:** You may submit comments, identified by ET Docket No. 21–363, by any of the following methods:

• *Electronic Filers:* Comments may be filed electronically using the internet by accessing the ECFS: *http://apps.fcc.gov/ecfs/.*

• *Paper Filers:* Parties who choose to file by paper must file an original and one copy of each filing.

Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

• Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.

• U.S. Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, DC 20554.

• Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID–19. See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy, Public Notice, DA 20–304 (March 19, 2020). *https://www.fcc.gov/document/fcc-closes-headquarters-open-window-and-changes-hand-delivery-policy.*

*People With Disabilities:* To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an email to *fcc504@fcc.gov* or call the Consumer & Governmental Affairs Bureau at 202–418–0530 (voice), 202–418–0432 (TTY).

**FOR FURTHER INFORMATION CONTACT:** Brian Butler, Office of Engineering and Technology, 202–418–2702,

*Brian.Butler@fcc.gov.* For information regarding the PRA information collection requirements contained in this PRA, contact Nicole Ongele, Office of Managing Director, at (202) 418–2991 or *Nicole.Ongele@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Notice of Proposed Rulemaking (NPRM), ET Docket No. 21–363, ET Docket No. 19–48, FCC 22–3, adopted on January 24, 2022 and released on January 25, 2022. The full text of this document is available by downloading the text from the Commission's website at: *https://www.fcc.gov/document/fcc-proposes-updates-standards-used-equipment-authorization.* When the FCC Headquarters reopens to the public, the full text of this document will also be available for public inspection and copying during regular business hours in the FCC Reference Center, 45 L Street NE, Washington, DC 20554. Alternative formats are available for people with disabilities (braille, large print, electronic files, audio format), by sending an email to *fcc504@fcc.gov* or calling the Consumer and Governmental Affairs Bureau at 202–418–0530 (voice), 202–418–0432 (TTY).

**Comment Filing Procedures**

Pursuant to §§ 1.415 and 1.419 of the Commission's rules, 47 CFR 1.415, 1.419, interested parties may file comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). *See Electronic Filing of Documents in Rulemaking Proceedings,* 63 FR 24121 (1998).

**Initial Paperwork Reduction Act of 1995 Analysis**

This document contains proposed modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and the Office of Management and Budget (OMB) to comment on the information collection requirements contained in this document, as required by the Paperwork Reduction Act of 1995, Public Law 104–13. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

***Ex Parte* Rules—Permit-But-Disclose**

The proceeding this proposed rule initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules, 47 CFR 1.1200 *et seq.* Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda, or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with 47 CFR 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**Synopsis**

**I. Background**

The Commission's proposals are limited to the incorporation by reference of standards that are associated with equipment authorization and the recognition of Telecommunication Certification Bodies (TCBs). Incorporation by reference is the process that Federal agencies use when referring to materials published elsewhere to give those materials the same force and effect of law in the Code of Federal Regulations as if the materials' text had actually been published in the **Federal Register**. 5 U.S.C. 552(a)(1) and Office of the Federal Register, IBR Handbook 1

(July 2018), *available at https://www.archives.gov/files/federal-register/write/handbook/ibr.pdf.* By using incorporation by reference, the Commission gives effect to technical instructions, testing methodologies, and other process documents that are developed and owned by standards development organizations. Referencing these documents in the Commission's rules substantially reduces the volume of material that would otherwise be published in the **Federal Register** and the Code of Federal Regulations. It also permits the Commission to more efficiently implement future standards updates. Once the Commission completes any necessary notice-and-comment rulemaking proceedings and applies agency expertise to ensure that any standards adopted are sound and appropriate, the Commission need only update the references to the standards in its rules.

*A. Equipment Authorization*

Section 302 of the Communications Act of 1934, as amended (the Act), 47 U.S.C. 302a(a), authorizes the Commission to make reasonable regulations governing the interference potential of devices that emit RF energy and can cause harmful interference to radio communications. The Commission generally implements this authority by establishing technical rules for RF devices. Examples may be found in 47 CFR parts 15, 22, 24, 27, and 90. One of the primary ways in which the Commission ensures compliance with the technical rules is through the equipment authorization program for RF devices, procedures for which are codified in part 2 of its rules. 47 CFR part 2 subpart J. The Office of Engineering and Technology (OET) administers the day-to-day operation of the equipment authorization program under authority delegated by the Commission. 47 CFR 0.241(b).

Part 2 of the Commission's rules provides two different approval procedures for RF devices subject to equipment authorization—certification and Supplier's Declaration of Conformity (SDoC). 47 CFR 2.901. Certification is a more rigorous approval process for RF devices with the greatest potential to cause harmful interference to other radio operations. A grant of certification is an equipment authorization issued by an FCC-recognized TCB based on an evaluation of the supporting documentation and test data submitted to the TCB. 47 CFR 2.907. SDoC allows a device to be marketed on the basis of testing performed in accordance with a Commission-approved methodology by

the manufacturer, assembler, importer, or seller itself without the need to submit an application to a TCB. 47 CFR 2.906. While both processes involve laboratory testing to demonstrate compliance with Commission requirements, testing associated with certification must be performed by an FCC-recognized accredited testing laboratory. 47 CFR 2.948(a).

Additionally, part 68 of the Commission's rules sets forth requirements to ensure that terminal equipment can be connected to the telephone network without harming its functioning and for the compatibility of hearing aids and land-line telephones so as to ensure that, to the fullest extent made possible by technology and medical science, people with hearing loss have equal access to communications services. In furtherance of these goals, part 68 includes unique, but similar rules related to equipment approval, TCB review, and laboratory testing. 47 CFR part 68 subpart D.

Standards

The Commission's equipment authorization rules, for example 47 CFR 2.910, 2.950, and 15.38, incorporate by reference various standards that have been established by standards-setting bodies including, but not limited to, the American National Standards Institute, Accredited Standards Committee (ASC) C63, a standards organization that is responsible for developing electromagnetic compatibility (EMC) measurement standards and testing procedures; the International Organization for Standardization (ISO), an independent, non-governmental international organization that develops voluntary international standards; and the International Electrotechnical Commission (IEC) which develops international standards for all electrical, electronic, and related technologies. Incorporating external standards within the Commission's rules has been a longstanding practice that reflects the Commission's desire, where appropriate, to harmonize its rules with international standards and aligns the Commission's rules with general federal agency guidance which urges government agencies to use industry developed standards rather than develop their own. OMB Circular A–119, Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities (updated Jan. 27, 2016), available at *https:// www.whitehouse.gov/omb/information-for-agencies/circulars/.*

1. Measurement Standards and Laboratory Testing Procedures.

Compliance testing is central to the equipment authorization program. Section 2.947 of the Commission's rules requires test data be measured in accordance with one of three types of standards and measurement procedures, including those acceptable to the Commission and published by national engineering societies such as the Electronic Industries Association, the Institute of Electrical and Electronics Engineers, Inc., and the American National Standards Institute. 47 CFR 2.947(a)(2). Accordingly, the Commission has incorporated by reference such standards into its rules when appropriate; use of these standards is intended to ensure the integrity of the measurement data associated with an equipment authorization. For example, certification applications for unlicensed part 15 intentional radiators (47 CFR 15.3(o)) must include compliance measurement data that was obtained in accordance with the procedures specified in ANSI C63.10—2013, "American National Standard of Procedures for Compliance Testing of Unlicensed Wireless Devices" (C63.10). 47 CFR 2.1041(a) and 15.31(a)(3). Other part 15 devices that are not designed to purposely transmit RF energy, unintentional radiators (47 CFR 15.3(z)), must be tested under procedures specified in ANSI C63.4— 2014: "American National Standard for Methods of Measurement of Radio-Noise Emissions from Low-Voltage Electrical and Electronic Equipment in the Range of 9 kHz to 40 GHz" (C63.4). 47 CFR 2.1041(a) and 15.31(a)(4). In addition to measurement procedures, portions of C63.4 specify particular requirements for the characteristics of test sites that are referenced in the Commission's rules. 47 CFR 2.910(c)(1) and 2.948(d). Specifically, these "test site validation" requirements are premised on the assumption that an open area test site provides the best conditions for field strength measurements of radiated emissions and test sites other than open area sites may be employed if they are properly calibrated so that the measurement results correspond to what would be obtained from an open area test site. 47 CFR 15.31(d).

2. Accreditation Standards

Compliance testing data associated with an application for certification must be obtained from a testing laboratory that has been accredited in accordance with the Commission's rules. 47 CFR 2.948(a). Accreditation of test laboratories is currently based on the International Organization for Standardization/International Electrotechnical Commission (ISO/IEC) Standard 17025:2005(E), "General requirements for the competence of testing and calibration laboratories" (ISO 17025), and on the FCC requirements. 47 CFR 2.948(e). It is the responsibility of the accreditation body to review the qualifications of a test laboratory's personnel, management systems, and record keeping and reporting practices; to send recognized experts to observe testing at the laboratory; and to verify the testing laboratory's competence to perform tests in accordance with FCC-related measurement procedures. Section 2.949 of the Commission's rules sets forth the requirements for the recognition of laboratory accreditation bodies. An entity seeking to be recognized by the Commission as an accreditation body for test laboratories must demonstrate that it complies with applicable ISO and IEC standards for recognizing such bodies and that it is competent in assessing test laboratories to perform measurements in support of the applicable FCC technical regulations. 47 CFR 2.949. The ISO/IEC standard currently used for recognizing accreditation bodies is ISO/IEC 17011:2004(E), "Conformity assessment—General requirements for accreditation bodies accrediting conformity assessment bodies" (ISO:17011). 47 CFR 2.949(b)(1) and 2.910(d)(1).

**II. Discussion**

In response to advancements in technologies and measurement capabilities, standards bodies periodically update their standards or adopt new standards to reflect best practices. The Commission's proposals here are based on such developments, as further informed by petitions for rulemaking filed with the Commission. Specifically, the Commission addresses two petitions filed by ASC C63: One seeking to incorporate by reference into its rules a new standard pertaining to test site validation; and one proposing to incorporate by reference a newer version of a currently referenced standard that addresses a variety of compliance testing requirements. The Commission also clarifies the status of two standards on which OET previously sought comment. *Office of Engineering and Technology Seeks Comment on Modifying the Equipment Authorization Rules to Reflect the Updated Versions of the Currently Referenced ANSI C63.4 and ISO/IEC 17025 Standards,* Public Notice, ET Docket No. 19–48, 34 FCC

Rcd 1904, 84 FR 20088 (May 8, 2019) (*Standards Update Notice*). The four standards subject to the NPRM proposals are briefly summarized in the table below.

| Standard | Standard being replaced | Proposed affected rule sections | Summary of rationale for proposed change |
|---|---|---|---|
| C63.25.1—2018 ...................................... | N/A ........................ New standard | 2.910 2.948 | Consolidates qualification and validation procedures for radiated test sites intended for use over various frequency ranges. The C63.25.1 standard included in this proposal covers 1 to 18 GHz. |
| C63.10—2020 ........................................ | C63.10—2013 ....... | 15.31 15.38 | Addresses changes in technology. |
| ISO/IEC 17011:2017 ............................. | 17011:2004 ........... | 2.910 | Provides more comprehensive requirements for accreditation bodies. |
|  |  | 2.948 2.949 2.950 2.960 68.160 |  |
| ISO/IEC 17025:2017 ............................. | 17025:2005 ........... | 2.910 | Provides more comprehensive requirements for testing and calibration labs. |
|  |  | 2.948 2.949 2.962 68.162 |  |

A. "*American National Standard Validation Methods for Radiated Emission Test Sites; 1 GHz to 18 GHz*" (*C63.25.1*)

On March 6, 2020, ASC C63 filed a petition for rulemaking requesting that the Commission incorporate by reference into the test site validation requirements of § 2.948(d) of the Commission's rules the ANSI C63.25.1—2018 standard, titled "American National Standard Validation Methods for Radiated Emission Test Sites; 1 GHz to 18 GHz" (C63.25.1). Petition of the American National Standards Institute, Accredited Standards Committee, C63 Requesting adoption of ANSI C63.25.1—2018 into the Commission's part 2 rules for EMC test site validation from 1 GHz–18 GHz (filed March 6, 2020) *https://www.fcc.gov/ecfs/filing/10306816406385* (*C63.25.1 Petition*). Under the Commission's current rules, measurement facilities used to make radiated emission measurements from 30 MHz to 1 GHz must comply with the site validation requirements in ANSI C63.4—2014 (clause 5.4.4), and, for radiated emission measurements from 1 GHz to 40 GHz the site validation requirements in ANSI C63.4—2014 (clause 5.5.1 a) 1)) apply. 47 CFR 2.948(d). In the *C63.25.1 Petition,* ASC C63 asks the Commission to adopt the C63.25.1 standard as an additional option for test site validation of radiated emission measurements from 1 GHz to 18 GHz.

ASC C63 describes how the C63.25.1 standard consolidates guidance from existing standards to provide test site validation procedures from 1 GHz to 18 GHz while providing an additional testing methodology and states that it expects that future iterations of the standard will cover additional frequencies. For example, the C63.25.1 standard includes a CISPR 16 technique known as the site voltage standing wave ratio (SVSWR) approach to validate test sites for frequencies above 1 GHz, which measures responses between antennas while varying their distances. C63.25.1 also introduces the option of using a new effective test validation method called time domain site validation (TDSV), which ASC C63 says is not yet available or recognized in comparable international standards. ASC C63 states that while TDSV is similar to SVSWR, in that both measure responses between antennas, varying the distance between antennas is not necessary; thus, it asserts, the TDSV method provides a reduction in the sensitivity of test results caused by small test setup changes at higher frequencies where the associated wavelengths are relatively short. Overall, ASC C63 asserts that TDSV improves measurement repeatability, provides additional information on the test site, and "reduces the sensitivity of the test results caused by small test setup changes due to statistical post processing incorporated in the TDSV method," while requiring less time to perform the validation. In short, ASC C63 has described reasons why, even though both SVSWR and TDSV use the same acceptance criterion, parties might want to use the TDSV method.

In consideration of ASC C63's request, the Commission proposes to incorporate ANSI C63.25.1—2018 into its rules, and to allow this standard to be used for test site validation of radiated emission measurements from 1 GHz to 18 GHz. The Commission tentatively concludes that the availability of this additional option would provide useful options and potential benefits in site validation testing, particularly considering that parties could continue to use the procedures currently described in the Commission's rules if they chose to do so. If the Commission adopts this proposal, it tentatively concludes that it is appropriate to incorporate the entire standard by reference. However, the Commission asks whether any procedures or techniques included in ANSI C63.25.1—2018 would not be appropriate for use in the context of demonstrating compliance with the Commission's equipment authorization rules. Commenters in this regard should provide details of their concerns and specifically cite any rule sections for which the new standard may be problematic. Additionally, for which other Commission rules would a reference to ANSI C63.25.1—2018 be appropriate? Because the Commission is proposing to incorporate ANSI C63.25.1—2018 as an option to an already existing requirement, the Commission tentatively concludes that there is no need to designate a transition period. The Commission seeks comment on these tentative conclusions.

B. "*American National Standard of Procedures for Compliance Testing of Unlicensed Wireless Devices*" *(ANSI C63.10)*

On February 4, 2021, the Commission received a petition from ASC C63 requesting that it incorporate by reference ANSI C63.10—2020 "American National Standard of Procedures for Compliance Testing of Unlicensed Wireless Devices" into the rules. Petition of the American National Standards Institute, Accredited Standards Committee, C63 Requesting adoption of ANSI C63.10—2020 into the parts 2 and 15 Rules for Compliance Testing Of Unlicensed Radio Devices (filed February 4, 2021). *https://www.fcc.gov/ecfs/filing/10204284915782* (*C63.10 Petition*). This standard, which was approved by ANSI on September 10, 2020, updates the measurement procedures set forth in ANSI C63.10—2013, which is currently referenced in 47 CFR 2.910(c)(2), 2.950(g), and 15.38(g)(3). The standard addresses "the procedures for testing the compliance of a wide variety of unlicensed wireless transmitters . . . including, but not limited to, remote control and security unlicensed wireless devices, frequency hopping and direct sequence spread spectrum devices, anti-pilferage devices, cordless telephones, medical unlicensed wireless devices, [U–NII] devices, intrusion detectors, unlicensed wireless devices operating on frequencies below 30 MHz, automatic vehicle identification systems, and other unlicensed wireless devices authorized by a radio regulatory authority." Daniel Hoolihan, *The American National Standards Committee on EMC—C63®—An Update on Recent Standards Development Activities* (June 30, 2021), *https://incompliancemag.com/article/the-american-national-standards-committee-on-emc-c63/*.

Specifically, this recent version of the standard includes the following changes and updates:

• Frequency hopping spread spectrum procedures were updated to ensure complete on and off times are correctly considered;

• Digital transmission system (DTS) and unlicensed national information infrastructure (U–NII) device procedures were updated to align with the latest FCC KDB guidance;

• Millimeter wave measurement procedures were updated;

• TV White Space test methods were added to the standard;

• Pulse desensitization considerations for frequency-modulated continuous wave (FMCW) type signals are now addressed by the standard;

• Procedures were added for wireless power transfer (WPT) devices that transmit information on the charging frequency;

• Measurement procedures were generally updated to allow for more accurate analyzer sweep time settings where "auto" was previously required;

• Editorial corrections/updates were made;

• Requirements for including spectral plots were added; and

• An informative annex was included to provide an overview of dynamic frequency selection (DFS) for U–NII devices.

In light of ASC C63's request, the Commission proposes to incorporate ANSI C63.10—2020 into its rules to replace existing references to ANSI C63.10—2013. The Commission tentatively concludes that it is appropriate to simply replace the existing standard references with references to the new standard, subject to an appropriate transition period. Are there any procedures or techniques included in ANSI C63.10—2020 that would not be appropriate for use in the context of demonstrating compliance with the Commission's equipment authorization rules? Commenters in this regard should provide details of their concerns and specifically cite any rule sections for which the new standard may be problematic. Would a transition period during which either version of ANSI C63.10 could be used remedy these concerns? If so, what time period would be appropriate, and should it generally apply to all rules affected by the new reference? Noting that testing laboratories are re-accredited every two years per 47 CFR 2.948(e), would a two-year transition be appropriate or would a shorter period be sufficient? Additionally, which, if any, of the Commission rules that do not currently reference ANSI C63.10—2013 should reference ANSI C63.10—2020?

C. "*Conformity assessment—Requirements for accreditation bodies accrediting conformity assessment bodies*" *(ISO/IEC 17011)*

Applications for RF devices that are subject to the certification requirements of part 2 of the Commission's rules must be filed with, and approved by, an accredited TCB. 47 CFR 2.907, 2.960(b). Additionally, terminal equipment intended for connection to the public switched telephone network must be subject to certification by a TCB or the Supplier's Declaration of Conformity procedures as set forth in part 68 of the Commission's rules. 47 CFR 68.201. Testing laboratories that provide compliance measurement data associated with part 2 certification applications also must be accredited. 47 CFR 2.948(a). In these instances, TCBs and testing laboratories are accredited by a "conformity assessment body," that meets the requirements and conditions of ISO/IEC 17011:2004 "Conformity assessment—Requirements for accreditation bodies accrediting conformity assessment bodies." 47 CFR 2.960 and 2.949. ISO/IEC 17011:2004 was incorporated into the Commission's rules in 2014. *See FCC Modifies Equipment Authorization Rules,* ET Docket No. 13–44, Report and Order, 29 FCC Rcd 16335, 16356–58, paras. 50–53; 80 FR 33425, 33430–31 (June 12, 2015). A new version of this standard, ISO/IEC 17011:2017, was published in November 2017. The revisions to the standard incorporate changes related to alignment with the International Organization for Standardization's Committee on Conformity Assessment (CASCO) common structure for standards and incorporation of CASCO common elements in clauses on impartiality, confidentiality, complaints and appeal, and management system; recognition of proficiency testing as an accreditation activity; addition of new definitions; introduction of the concept of risk; and incorporation of competence criteria in the document, including an informative annex on knowledge and skills. *See* International Organization for Standardization, *ISO/IEC 17011:2004(E): Conformity assessment—General requirements for accreditation bodies accrediting conformity assessment bodies,* First Edition, (September 2004); International Organization for Standardization, *ISO/IEC 17011:2017: Conformity assessment—Requirements for accreditation bodies accrediting conformity assessment bodies,* Second Edition (November 2017). The Commission proposes to replace the references to ISO/IEC 17011:2004(E) in 47 CFR 2.910, 2.948, 2.949, 2.950, 2.960, and 68.160 with references to ISO/IEC 17011:2017(E), subject to a reasonable transition period. Commenters with concerns related to updating any of these references should specifically cite any rule sections for which the updated standard may be problematic or portions of ISO/IEC 17011:2017(E) that should be excluded from the updated incorporation by reference and provide alternatives or a detailed explanation of their concerns. To ensure adequate time for the transition, the Commission proposes a two-year transition period during which both versions of ISO/IEC

17011 could be used. Is this time period sufficient and, if not, what would be an appropriate timeframe?

*D. Other Standards*

1. 2019 Public Notice

In April of 2019, OET sought comment on updating the Commission's rules to reflect recent changes to two standards: ISO/IEC 17025:2017(E) "General requirements for the competence of testing and calibration laboratories" and ANSI ASC C63.4a—2017 "American National Standard for Methods of Measurement of Radio-Noise Emissions from Low-Voltage Electrical and Electronic Equipment in the Range of 9 kHz to 40 GHz, Amendment 1: Test Site Validation." In opening up the instant docket, we seek a fresh record on these matters, as set forth in the proposals that we lay out in detail below. Accordingly, we are terminating the docket that the *Standards Update Notice* had opened (*i.e.,* ET Docket No. 19–48).

a. "General Requirements for the Competence of Testing and Calibration Laboratories" (ISO/IEC 17025)

Measurement data intended to demonstrate compliance with certain Commission requirements must be obtained from an accredited testing laboratory. 47 CFR 2.948(a). Currently, 47 CFR 2.910, 2.948, 2.949, 2.962, and 68.162 reference ISO/IEC 17025:2005(E) for the requirements related to test laboratory accreditation. Laboratory accreditation bodies assess a variety of aspects of a laboratory, including the technical competence of staff; the validity and appropriateness of test methods; traceability of measurements and calibration to national standards; suitability, calibration, and maintenance of the testing environment; sampling, handling, and transportation of test items; and quality assurance of test and calibration data. In November 2017, ISO/IEC published ISO/IEC 17025:2017(E)—a new version of the test laboratory accreditation standard currently referenced in the Commission's rules. In addition to adding a definition of "laboratory," the new version replaces certain prescriptive requirements with performance-based requirements and allows for greater flexibility in satisfying the standard's requirements for processes, procedures, documented information, and organizational responsibilities.

*Standards Update Notice,* 34 FCC Rcd at 1905 and n.8 (citing *ISO/IEC 17025 General requirements for the competence of testing and calibration laboratories,* ISO (2017), *available at https://www.ukas.com/download/ brochures/ISO-17025-Brochure_EN_ FINAL.pdf).*

In the *Standards Update Notice,* OET proposed to update the Commission's rules by replacing references to ISO/IEC 17025:2005(E) with references to ISO/IEC 17025:2017(E). All comments received were supportive of this updated reference. ANSI ASC C63, while supportive, stated that "ASC C63 also supports the transition period (two years are remaining) to the mandatory use of ISO/IEC 17025:2017; provided however, that the FCC only accept test lab accreditations for labs that meet the requirements of Clause 8.1—Option A of the standard, and that such accreditations explicitly state that the test lab is accredited only in accordance with Option A." Reply Comments of ASC C63, ET Docket No. 19–48, at 2.

The Commission proposes to incorporate by reference into its rules ISO/IEC 17025:2017 in its entirety, including Clause 8.1—Option A and Option B and update 47 CFR 68.162(d)(1) to correct typographical errors in the reference of two standards: ISO/IEC 17065 and ISO/IEC 17025. No other party has raised concerns with the availability of two options and ASC C63 did not provide detailed rationale to support their request to incorporate only Option A. In fact, Annex B of ISO/IEC 17025:2017 states that "[b]oth options are intended to achieve the same result in the performance of the management system and compliance with clauses 4 to 7." It is the Commission's understanding that Option B would allow laboratories to operate a quality management system that conforms to a certain standard from the International Organization for Standardization (*i.e.,* ISO 9001) and that Option A of ISO/IEC 17025:2017 incorporates relevant requirements of that same standard. OET believes that Option A is more commonly used but Option B is available because some organizations have implemented an ISO 9001 system and would not need to take additional actions to demonstrate compliance. *International Organization for Standardization, ISO/IEC 17025:2017: General requirements for the competence of testing and calibration laboratories* at Appendix B, Third Edition (November 2017). Accordingly, the Commission tentatively concludes that the flexibility of both options would enable entities who have already implemented a quality management system that would satisfy Option B to avoid the need to take further steps to demonstrate compliance and it seeks comment on this tentative conclusion and on any concerns with providing both options.

While both ISO/IEC 17025:2005(E) and ISO/IEC 17025:2017(E) were considered valid during the transition period in effect at the time of the *Standards Update PN,* accreditations to ISO/IEC 17025:2005(E) became invalid after June 1, 2021. In the *Standards Update PN,* OET proposed to adopt a three-year transition period for use of the proposed updated standard. In consideration of the time that has passed since publication of the *Standards Update PN,* combined with the facts that the Commission's rules require test laboratories to complete the accreditation process every two years (47 CFR 2.948(e)) and that the prior standard has since become invalid within the standards body, the Commission proposes a two-year transition period for compliance with ISO/IEC 17025:2017(E). The Commission seeks comment on the duration of this proposed transition period and how it should be reflected in any transition plans that it adopts.

b. "Addendum to the American National Standard for Methods of Measurement of Radio-Noise Emissions from Low-Voltage Electrical and Electronic Equipment in the Range of 9 kHz to 40 GHz, Amendment 1: Test Site Validation" (ANSI C63.4a—2017)

In late 2017, ASC C63 published ANSI C63.4a—2017 "Addendum to the American National Standard for Methods of Measurement of Radio-Noise Emissions from Low-Voltage Electrical and Electronic Equipment in the Range of 9 kHz to 40 GHz, Amendment 1: Test Site Validation" (ANSI C63.4a—2017). ASC C63 requested that we incorporate by reference in the Commission's rules ANSI C63.4a—2017 to replace the existing ANSI C63.4—2014: "American National Standard for Methods of Measurement of Radio-Noise Emissions from Low-Voltage Electrical and Electronic Equipment in the Range of 9 kHz to 40 GHz" (ANSI C63.4). ASC C63 originally filed comments in ET Docket No. 15–170, which were subsequently moved into ET Docket No 19–48. The Commission's rules reference ANSI 63.4 as an electromagnetic compatibility (EMC) measurement standard for unintentional radiators. 47 CFR 2.910, 2.948, 2.950, 15.31, 15.35, and 15.38. As described in ASC C63's filing, the standard was updated to resolve certain normalized site attenuation issues (including the measurement of equipment under test that exceeds 2 meters in height) and make a variety of corrections, clarifications, and

modifications. In the *Standards Update Notice,* OET sought comment on incorporating by reference ANSI C63.4a—2017 in the appropriate rules. *Standards Update Notice* at 1904–05. Some commenters supported incorporation of the amended standard. However, the Commission received several negative comments, generally citing costs associated with the procedure and stating that there were no problems with existing procedures that warrant adopting an alternative procedure. Further, the Commission indicates its understanding that ASC C63 has made substantial progress toward addressing these and other controversial issues in a pending modification. Based on the comments received and the potential development of an additional modification to the standard, the Commission tentatively concludes that ANSI C63.4 continues to sufficiently address current needs and that incorporation by reference of ANSI C63.4a—2017 into its rules is not warranted at this time. The Commission seeks comment on this tentative conclusion.

2. Additional Updates: "Calibration and Testing Laboratory Accreditation Systems—General Requirements for Operation and Recognition" (ISO/IEC Guide 58:1993(E)); "General Requirements for Assessment and Accreditation of Certification/ Registration Bodies" (ISO/IEC Guide 61:1996(E)); and "General Requirements for Bodies Operating Product Certification Systems" (ISO/IEC Guide 65:1996(E))

The Commission notes that its part 2 rules incorporate several references that have become outdated as a result of prior updates to standards that were phased in over specific transition periods. 47 CFR 2.910 and 2.950. Once the transition period passed, the newer standards became the only valid procedure for compliance with the Commission's rules, rendering the prior references no longer relevant. Accordingly, the Commission proposes to delete from § 2.910 of the Commission's rules references to: ISO/ IEC Guide 58:1993(E), "Calibration and testing laboratory accreditation systems—General requirements for operation and recognition," First Edition 1993; ISO/IEC Guide 61:1996(E), "General requirements for assessment and accreditation of certification/ registration bodies," First Edition 1996; and (6) ISO/IEC Guide 65:1996(E), "General requirements for bodies operating product certification systems." The Commission also proposes to delete the related transition

periods provided in § 2.950. 47 CFR 2.910(d)4 through 6 and 47 CFR 2.950 (b), (c) and (d). Additionally, the Commission also proposes to make administrative changes to its rules to reflect any necessary changes to rule cross references that would result from the proposed rule changes.

The Commission seeks comment on whether there are additional conforming or administrative updates to its t rules that should be considered. Additionally, the Commission asks what other rule modifications, including updating other standards currently referenced in the rules or incorporating by reference additional standards not currently referenced in the rules, would be necessary to give full effect to its proposals? Because the standards-setting process is marked by ongoing work to create, review, and update standards, the Commission recognizes that the proposals are part of a larger and continuing effort to ensure that its rules incorporate appropriate standards and reflect relevant standards updates. Commission staff actively monitor the work of standards development organizations, and the Commission is aware that additional standards relevant to the telecommunications sector are in various stages of drafting, voting, and publication. While such developments may warrant the Commission's consideration in the future, it is not seeking comment on such standards within this Notice of Proposed Rulemaking.

**III. Incorporation by Reference**

Sections 2.910 and 2.948 of the proposed rules provide for an additional standard ("American National Standard Validation Methods for Radiated Emission Test Sites; 1 GHz to 18 GHz" (ANSI C63.25.1)) that would be used for test site validation of radiated emission measurements from 1 GHz to 18 GHz. Sections 15.31 and 15.38 of the proposed rules provide for a standard ("American National Standard of Procedures for Compliance Testing of Unlicensed Wireless Devices" (ANSI C63.10)) that would update existing procedures for testing the compliance of a wide variety of unlicensed wireless transmitters. Sections 2.910, 2.948, 2.949, 2.950, 2.960, and 68.160 provide for a standard ("Conformity assessment—Requirements for accreditation bodies accrediting conformity assessment bodies" (ISO/IEC 17011)) that would update requirements and conditions for conformity assessment bodies that accredit TCBs and testing laboratories. Sections 2.910, 2.948, 2.949, 2.962, and 68.62 provide a standard ("General requirements for the

competence of testing and calibration laboratories" (ISO/IEC 17025)) that would replace certain prescriptive requirements with performance-based requirements for test laboratory accreditation. The OFR has regulations concerning incorporation by reference. 1 CFR part 51. These regulations require that, for a proposed rule, agencies must discuss in the preamble to the proposed rule the way in which materials that the agency incorporates by reference are reasonably available to interested parties, and how interested parties can obtain the materials. Additionally, the preamble to the proposed rule must summarize the material. 1 CFR 51.5(a).

In accordance with the OFR's requirements, the discussion in section II.A. of this preamble summarizes the provisions of ANSI C63.25.1—2018. Interested persons may purchase a copy of ANSI C63.25.1 from the sources provided in 47 CFR 2.910. A copy of the standard may also be inspected at the FCC's main office. The discussion in section II.B. of this preamble summarizes the provisions of ANSI C63.10—2020. Interested persons may purchase a copy of ANSI C63.10—2018 from the sources provided in 47 CFR 2.910. A copy of the standard may also be inspected at the FCC's main office. The discussion in section II.C. of this preamble summarizes the provisions of ISO/IEC 17011:2017(E). Interested persons may purchase a copy of ISO/IEC 17011:2017(E) from the sources provided in 47 CFR 2.910. A copy of the standard may also be inspected at the FCC's main office. The discussion in sections I.A.1. and II.D.1.a of this preamble summarizes the provisions of ISO/IEC 17025:2005(E). Interested persons may purchase a copy of ISO/IEC 17025:2005(E) from the sources provided in 47 CFR 2.910. A copy of the standard may also be inspected at the FCC's main office. The discussion in section II.D.1.a. of this preamble summarizes the provisions of ISO/IEC 17025:2017(E). Interested persons may purchase a copy of ISO/IEC 17011:2017(E) from the sources provided in 47 CFR 2.910. A copy of the standard may also be inspected at the FCC's main office.

**IV. Procedural Matters**

*Initial Regulatory Flexibility Analysis.* As required by the Regulatory Flexibility Act of 1980 (RFA) (*see* 5 U.S.C. 603), as amended (RFA), the Commission has prepared an Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities of the proposals addressed in this Notice of Proposed Rulemaking.

The IRFA is found in Appendix B. Written public comments are requested on the IRFA. These comments must be filed in accordance with the same filing deadlines for comments on the Notice of Proposed Rulemaking, and they should have a separate and distinct heading designating them as responses to the IRFA. The Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, will send a copy of this Notice of Proposed Rulemaking, including the IRFA, to the Chief Counsel for Advocacy of the Small Business Administration, in accordance with the RFA. *See* 5 U.S.C. 603(a).

*Paperwork Reduction Act.* This document contains proposed modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and the Office of Management and Budget (OMB) to comment on the information collection requirements contained in this document, as required by the Paperwork Reduction Act of 1995, Public Law 104–13. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

*Ex Parte Rules—Permit but Disclose.* Pursuant to § 1.1200(a) of the Commission's rules, (47 CFR 1.1200(a)) this Notice of Proposed Rulemaking shall be treated as a ''permit-but-disclose'' proceeding in accordance with the Commission's *ex parte* rules. 47 CFR 1.1200 *et seq.* Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments

can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.,* .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**List of Subjects**

*47 CFR Parts 2, and 68*

Communications equipment, Incorporation by reference, Reporting and recordkeeping requirements, Telecommunications.

*47 CFR Part 15*

Communications equipment, Incorporation by reference, Reporting and recordkeeping requirements.

*47 CFR Part 73*

Communications equipment, Reporting and recordkeeping requirements, Telecommunications.

Federal Communications Commission.

**Katura Jackson,**

*Federal Register Liaison Officer.*

**Proposed Rules**

For the reasons discussed in the preamble, the Federal Communications Commission proposes to amend 47 CFR parts 2, 15, 68, and 73 as follows:

**PART 2—FREQUENCY ALLOCATIONS AND RADIO TREATY MATTERS; GENERAL RULES AND REGULATIONS**

■ 1. The authority citation for part 2 continues to read as follows:

**Authority:** 47 U.S.C. 154, 302a, 303, and 336.

■ 2. Revise § 2.910 to read as follows:

**§ 2.910   Incorporation by Reference.**

Certain material is incorporated by reference into this part with the approval of the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in this section, the Federal Communications Commission (FCC) must publish a document in the **Federal**

**Register** and the material must be available to the public. All approved material is available for inspection at the FCC and at the National Archives and Records Administration (NARA). Contact FCC at the address indicated in 47 CFR 0.401(a), tel: (202) 418–0270. For information on the availability of this material at NARA, email: *fr.inspection@nara.gov,* or go to: *www.archives.gov/federal-register/cfr/ ibr-locations.html.* The material may be obtained from the following source(s):

(a) International Electrotechnical Commission (IEC), IEC Central Office, 3, rue de Varembe, CH–1211 Geneva 20, Switzerland; email: *inmail@iec.ch;* website: *www.iec.ch.*

(1) CISPR 16–1–4:2010–04: ''Specification for radio disturbance and immunity measuring apparatus and methods—Part 1–4: Radio disturbance and immunity measuring apparatus— Antennas and test sites for radiated disturbance measurements'', Edition 3.0, 2010–04; IBR approved for § 2.948(d).

(2) [Reserved]

(b) Institute of Electrical and Electronic Engineers (IEEE), 2001 L Street NW, Suite 700, Washington, DC 20036–4910, tel: +1 800 701 IEEE (USA and Canada), +1 732 981 0060 (Worldwide), email: *stds-info@ieee.org;* website: *www.ieee.org.*

(1) ANSI C63.4—2014: ''American National Standard for Methods of Measurement of Radio-Noise Emissions from Low-Voltage Electrical and Electronic Equipment in the Range of 9 kHz to 40 GHz'', ANSI approved June 13, 2014 ; IBR approved for § 2.948(d).

(2) ANSI C63.25.1—2018, ''American National Standard Validation Methods for Radiated Emission Test Sites, 1 GHz to 18 GHz'', ANSI approved December 17, 2018; IBR approved for § 2.948(d).

(3) ANSI C63.26—2015, ''American National Standard of Procedures for Compliance Testing of Transmitters Used in Licensed Radio Services'', ANSI approved December 11, 2015, IBR approved for § 2.1041(b).

(c) International Organization for Standardization (ISO), 1, ch. De la Voie-Creuse, CP 56, CH–1211, Geneva 20, Switzerland; tel.: + 41 22 749 01 11; fax: + 41 22 733 34 30; email: *central@ iso.org;* website: *www.iso.org.*

(1) ISO/IEC 17011:2004(E), ''Conformity assessment—General requirements for accreditation bodies accrediting conformity assessment bodies'', First Edition, 2004–09–01; IBR approved for §§ 2.948(e); 2.949(b); 2.950(a); 2.960(c).

(2) ISO/IEC 17011:2017(E), ''Conformity assessment—Requirements for accreditation bodies accrediting

conformity assessment bodies'', Second Edition, November 2017; IBR approved for §§ 2.948(e); 2.949(b); 2.950(a); 2.960(c).

(3) ISO/IEC 17025:2005(E), "General requirements for the competence of testing and calibration laboratories'', Second Edition, 2005–05–15; IBR approved for §§ 2.948(e); 2.949(b); 2.950(b); 2.962(c) and (d).

(4) ISO/IEC 17025:2017, "General requirements for the competence of testing and calibration laboratories'', Third Edition, November 2017; IBR approved for §§ 2.948(e); 2.949(b); 2.950(b); 2.962(c) and (d).

(5) ISO/IEC 17065:2012(E), "Conformity assessment—Requirements for bodies certifying products, processes and services'', First Edition, 2012–09–15; IBR approved for §§ 2.960(b); 2.962(b), (c), (d), (f), and (g).

**Note 1 to § 2.910:** The standard(s) listed in paragraph (b) of this section may also be obtained through the IEEE Standards Association Standards Store: P.O. Box 95715, Chicago, IL 60694–5715; website: *www.techstreet.com/ieee.*

**Note 2 to § 2.910:** The standard(s) listed in paragraphs (b) and (c) of this section may also be obtained from the American National Standards Institute (ANSI) through its NSSN operation (*www.nssn.org*), at Customer Service, American National Standards Institute, 25 West 43rd Street, New York, NY 10036, phone: (212) 642–4900.

■ 3. Amend § 2.948 by revising paragraph (d) to read as follows:

### § 2.948 Measurement facilities.

\* \* \* \* \*

(d) When the measurement method used requires the testing of radiated emissions on a validated test site, the site attenuation must comply with the requirements of sections 5.4.4 through 5.5 of the following procedure: ANSI C63.4 (incorporated by reference, see § 2.910). Measurement facilities used to make radiated emission measurements from 30 MHz to 1 GHz must comply with the site validation requirements in ANSI C63.4 (clause 5.4.4); for radiated emission measurements from 1 GHz to 18 GHz must comply with either the site validation requirement of ANSI C63.25.1 or ANSI C63.4 (clause 5.5.1 a) 1)), such that the site validation criteria called out in CISPR 16–1–4 (incorporated by reference, see § 2.910) is met; for radiated emission measurements from 18 GHz to 40 GHz must comply with the site validation requirement of ANSI C63.4 (clause 5.5.1 a) 1)), such that the site validation criteria called out in CISPR 16–1–4 (incorporated by reference, see § 2.910)

is met. Test site revalidation must occur on an interval not to exceed three years.

\* \* \* \* \*

■ 4. Revise § 2.950 to read as follows:

### § 2.950 Transition periods.

(a) Prior to [DATE 2 YEARS AFTER EFFECTIVE DATE OF FINAL RULE], an organization accrediting the prospective accredited testing laboratory must be capable of meeting the requirements and conditions of ISO/IEC 17011:2004 (incorporated by reference, see § 2.910) or ISO/IEC 17011:2017 (incorporated by reference, see § 2.910). On or after [DATE 2 YEARS AFTER EFFECTIVE DATE OF FINAL RULE], an organization accrediting the prospective accredited testing laboratory must be capable of meeting the requirements and conditions of ISO/IEC 17011:2017 (incorporated by reference, see § 2.910).

(b) Prior to [DATE 2 YEARS AFTER EFFECTIVE DATE OF FINAL RULE], an organization accrediting the prospective accredited testing laboratory must be capable of meeting the requirements and conditions of ISO/IEC 17025:2005 (incorporated by reference, see § 2.910) or ISO/IEC 17025:2017 (incorporated by reference, see § 2.910). On or after [DATE 2 YEARS AFTER EFFECTIVE DATE OF FINAL RULE], an organization accrediting the prospective accredited testing laboratory must be capable of meeting the requirements and conditions of ISO/IEC 17025:2017 (incorporated by reference, see § 2.910).

(c) All radio frequency devices that were authorized under the verification or Declaration of Conformity procedures prior to November 2, 2017, must continue to meet all requirements associated with the applicable procedure that were in effect immediately prior to November 2, 2017. If any changes are made to such devices after November 2, 2018, the requirements associated with the Supplier's Declaration of Conformity apply.

## PART 15—RADIO FREQUENCY DEVICES

■ 5. The authority citation for part 15 continues to read as follows:

**Authority:** 47 U.S.C. 154, 302a, 303, 304, 307, 336, 544a, and 549.

■ 6. Amend § 15.31 by revising paragraph (a)(3) to read as follows:

### § 15.31 Measurement standards.

(a) \* \* \*

(3) Other intentional radiators must be measured for compliance using the following procedure: ANSI C63.10 (incorporated by reference, see § 15.38).

\* \* \* \* \*

■ 7. Amend § 15.37 by adding paragraph (r) to read as follows:

### § 15.37 Transition provisions for compliance with this part.

\* \* \* \* \*

(r) Prior to [DATE 2 YEARS AFTER EFFECTIVE DATE OF FINAL RULE], measurements for intentional radiators subject to § 15.31(a)(3) must be made using the procedures in ANSI C63.10–2013 or ANSI C63.10—2020 (incorporated by reference, see § 15.31(a)(3)). On or after [DATE 2 YEARS AFTER EFFECTIVE DATE OF FINAL RULE], measurements for intentional radiators subject to this part 15 must be made using the procedures in ANSI C63.10—2020 (incorporated by reference, see § 15.31(a)(3)).

■ 8. Amend § 15.38 as follows:
■ a. Throughout the section,
■ i. By removing the text ''The following documents are available from the following address:'' wherever it appears;
■ ii. By removing the text ''The following document is available from the'' in paragraph (e); and
■ iii. By removing the text ''The following documents are available from the following address:'' in paragraph (h);
■ b. By revising paragraphs (a) and (g).

The revisions read as follows:

### § 15.38 Incorporation by Reference.

(a) Certain material is incorporated by reference into this part with the approval of the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in this section, the Federal Communications Commission (FCC) must publish a document in the **Federal Register** and the material must be available to the public. All approved material is available for inspection at the FCC and at the National Archives and Records Administration (NARA). Contact FCC at the address indicated in 47 CFR 0.401(a), Tel: (202) 418–0270. For information on the availability of this material at NARA, email: *fr.inspection@nara.gov,* or go to: *www.archives.gov/federal-register/cfr/ibr-locations.html.* The material may be obtained from the source(s) in the following paragraph(s) of this section.

\* \* \* \* \*

(g) Institute of Electrical and Electronic Engineers (IEEE), 2001 L Street NW, Suite 700, Washington, DC 20036–4910, tel: +1 800 701 IEEE (USA and Canada), +1 732 981 0060 (Worldwide), email: *stds-info@ieee.org;* website: *www.ieee.org.*

(1) ANSI C63.4—2014: "American National Standard for Methods of Measurement of Radio-Noise Emissions

from Low-Voltage Electrical and Electronic Equipment in the Range of 9 kHz to 40 GHz'' ' ANSI approved June 13, 2014; IBR approved for §§ 15.31(a); 15.35(a).

(2) ANSI C63.10—2013, ''American National Standard of Procedures for Compliance Testing of Unlicensed Wireless Devices'', ANSI approved June 27, 2013; IBR approved for §§ 15.31(a); 15.37(r) .

(3) ANSI C63.10—2020, ''American National Standard of Procedures for Compliance Testing of Unlicensed Wireless Devices'', ANSI approved January 29, 2021; IBR approved for §§ 15.31(a); 15.37(r).

\*    \*    \*    \*    \*

**Note 1 to § 15.38:** The standard(s) listed in paragraph (g) of this section may also be obtained through IEEE Standards Association Store: P.O. Box 95715, Chicago, IL 60694–5715; website: *www.techstreet.com/ieee.*

## PART 68—CONNECTION OF TERMINAL EQUIPMENT TO THE TELEPHONE NETWORK

■ 9. The authority citation for part 68 continues to read as follows:

**Authority:** 47 U.S.C. 154, 303, and 610.

■ 10. Amend § 68.160 by revising paragraphs (c)(1) and (d) to read as follows:

### § 68.160   Designation of Telecommunication Certification Bodies (TCBs).

\*    \*    \*    \*    \*

(c) \* \* \*

(1) Prior to [DATE 2 YEARS AFTER EFFECTIVE DATE OF FINAL RULE], the organization accrediting the prospective telecommunication certification body must be capable of meeting the requirements and conditions of ISO/IEC 17011:2014 or ISO/IEC 17011:2017. On or after [DATE 2 YEARS AFTER EFFECTIVE DATE OF FINAL RULE], the organization accrediting the prospective telecommunication certification body must be capable of meeting the requirements and conditions of ISO/IEC 17011:2017.

\*    \*    \*    \*    \*

(d) *Incorporation by reference.* The material listed in this paragraph (d) is incorporated by reference into this section with the approval of the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in this section, the Federal

Communications Commission (FCC) must publish a document in the **Federal Register** and the material must be available to the public. All approved material is available for inspection at the FCC and at the National Archives and Records Administration (NARA). Contact FCC at the address indicated in 47 CFR 0.401(a), Tel: (202) 418–0270. For information on the availability of this material at NARA, email: *fr.inspection@nara.gov,* or go to: *www.archives.gov/federal-register/cfr/ibr-locations.html.* The material may be obtained from the following source(s) in this paragraph (d):

(1) International Organization for Standardization (ISO), 1, ch. De la Voie-Creuse, CP 56, CH–1211, Geneva 20, Switzerland; *www.iso.org;* Tel.: + 41 22 749 01 11; Fax: + 41 22 733 34 30; email: *central@iso.org.*

(i) ISO/IEC 17011:2004(E), ''Conformity assessment—General requirements for accreditation bodies accrediting conformity assessment bodies,'' First Edition, 2004–09–01.

(ii) ISO/IEC 17011:2017(E), ''Conformity assessment—Requirements for accreditation bodies accrediting conformity assessment bodies,'' Second Edition, November 2017.

(iii) ISO/IEC 17065:2012(E), ''Conformity assessment—Requirements for bodies certifying products, processes and services,'' First Edition, 2012–09–15.

(2) [Reserved]

**Note 1 to paragraph (d):** The standard(s) listed in paragraph (d)(1) of this section are also available from {1} International Electrotechnical Commission (IEC) Central Office, 3, rue de Varembe, CH–1211 Geneva 20, Switzerland; email: *inmail@iec.ch;* website: *www.iec.ch;* and {2} American National Standards Institute (ANSI) through its NSSN operation (*www.nssn.org*), Customer Service, American National Standards Institute, 25 West 43rd Street, New York, NY 10036; telephone: (212) 642–4900.

■ 11. Amend § 68.162 by revising paragraphs (d)(1) and (i) to read as follows:

### § 68.162   Requirements for Telecommunication Certification Bodies.

\*    \*    \*    \*    \*

(d) \* \* \*

(1) In accordance with the provisions of ISO/IEC 17065 the evaluation of a product, or a portion thereof, may be performed by bodies that meet the applicable requirements of ISO/IEC 17025 and ISO/IEC 17065, in

accordance with the applicable provisions of ISO/IEC 17065, for external resources (outsourcing) and other relevant standards. Evaluation is the selection of applicable requirements and the determination that those requirements are met. Evaluation may be performed by using internal TCB resources or external (outsourced) resources.

\*    \*    \*    \*    \*

(i) *Incorporation by reference.* The material listed in this paragraph (i) is incorporated by reference into this section with the approval of the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in this section, the Federal Communications Commission (FCC) must publish a document in the **Federal Register** and the material must be available to the public. All approved material is available for inspection at the FCC and at the National Archives and Records Administration (NARA). Contact FCC at the address indicated in 47 CFR 0.401(a), Tel: (202) 418–0270. For information on the availability of this material at NARA, email: *fr.inspection@nara.gov,* or go to: *www.archives.gov/federal-register/cfr/ibr-locations.html.* The material may be obtained from the following source(s) in this paragraph (i):

(1) International Organization for Standardization (ISO), 1, ch. De la Voie-Creuse, CP 56, CH–1211, Geneva 20, Switzerland; *www.iso.org;* Tel.: + 41 22 749 01 11; Fax: + 41 22 733 34 30; email: *central@iso.org.*

(i) ISO/IEC 17025:2017, ''General requirements for the competence of testing and calibration laboratories,'' Third Edition, November 2017.

(ii) ISO/IEC 17065:2012(E), ''Conformity assessment—Requirements for bodies certifying products, processes and services,'' First Edition, 2012–09–15.

(2) [Reserved]

**Note 1 to paragraph (i):** The standard(s) listed in paragraph (i)(1) of this section are also available from {1} International Electrotechnical Commission (IEC) Central Office, 3, rue de Varembe, CH–1211 Geneva 20, Switzerland; email: *inmail@iec.ch;* website: *www.iec.ch;* and {2} American National Standards Institute (ANSI) through its NSSN operation (*www.nssn.org*), Customer Service, American National Standards Institute, 25 West 43rd Street, New York, NY 10036; telephone: (212) 642–4900.

## PART 73—RADIO BROADCAST SERVICES

■ 12. The authority citation for part 73 continues to read as follows:

**Authority:** 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

■ 13. Amend § 73.1660 by revising Note 1 to paragraph (a)(1) to read as follows:

**§ 73.1660   Acceptability of broadcast transmitters.**

*       *       *       *       *

**Note 1 to paragraph (a)(1):** The verification procedure has been replaced by Supplier's Declaration of Conformity. AM, FM, and TV transmitters previously authorized under subpart J of part 2 of this chapter may remain in use. See § 2.950 of this chapter.

*       *       *       *       *

[FR Doc. 2022–05190 Filed 3–16–22; 8:45 am]

**BILLING CODE 6712–01–P**

# ABSTRACT

IEEE/ANSI C63.10-2020

American National Standard Of Procedures For Compliance Testing Of
Unlicensed Wireless Devices

Revision Standard - Active. The procedures for testing the compliance of a wide variety of unlicensed wireless transmitters (also called intentional radiators and license-exempt transmitters) including, but not limited to, remote control and security unlicensed wireless devices, frequency hopping and direct sequence spread spectrum devices, antipilferage devices, cordless telephones, medical unlicensed wireless devices, Unlicensed National Information Infrastructure (U-NII) devices, intrusion detectors, unlicensed wireless devices operating on frequencies below 30 MHz, automatic vehicle identification systems, and other unlicensed wireless devices authorized by a radio regulatory authority are covered in this standard. Excluded by this standard are test procedures for unlicensed wireless devices already covered in other published standards (e.g., Unlicensed Personal Communication Services (UPCS) devices).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This brief complies with type-volume limit of Fed. R. App. P. 32(a)7(B) because, excluding parts of the document exempted by Fed R. App. P. 32(f), this brief contains 8717 words.

2. This brief complies with the typeface requirements of Fed R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in Microsoft Office Word, LTSC Professional Plus 2021 in 14-point Times New Roman.


/s/ Alan B. Morrison

Attorney for Petitioners

March 27, 2024