ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1311

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PUBLIC.RESOURCE.ORG, INC., ET AL.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,

*Respondents.*

---

On Petition for Review of an Order of the Federal Communications Commission

---

## BRIEF OF *AMICI CURIAE*
## REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND THE
## NEW YORK TIMES COMPANY IN SUPPORT OF PETITIONERS

---

Christopher T. Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9125
cbavitz@law.harvard.edu

Counsel for *Amici Curiae*
Reporters Committee for Freedom of the
Press and The New York Times Company

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. R. 26.1, The New York

Times Company, a publicly traded company, states that it has no parent company

and that no publicly held corporation owns 10 percent or more of its stock. The

Reporters Committee for Freedom of the Press certifies that it is an unincorporated

association of reporters and editors with no parent corporation and no stock.


Dated: April 3, 2024                    /s/ Christopher T. Bavitz

                                        Christopher T. Bavitz
                                        Cyberlaw Clinic
                                        Harvard Law School
                                        1557 Massachusetts Avenue
                                        Cambridge, MA 02138
                                        (617) 384-9125
                                        cbavitz@law.harvard.edu

                                        Counsel for *Amici Curiae*
                                        Reporters Committee for Freedom of the
                                        Press and The New York Times Company

## CIRCUIT RULE 29(D) STATEMENT

*Amici curiae* certify they are not aware of any other *amicus* brief addressing the subject of this brief—in particular, representing the interest of journalists who require access to the text of regulations and standards incorporated therein by reference in order to educate the public on laws that govern their laws. A separate brief is necessary to permit the *amici* joining this brief to offer the unique and important perspective of media organizations on the issues before the court.

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amici curiae* certify as following:

**(A) Parties and Amici.**

Besides the following, all parties, intervenors, and *amici* appearing before this Court are listed in the Brief for Petitioner filed March 27, 2024, and any amicus briefs filed prior to this one:

Reporters Committee for Freedom of the Press

The New York Times Company

**(B) Rulings Under Review.**

The ruling under review is the FCC's 2023 final rule, *Updating References to Standards Related to the Commission's Equipment Authorization Program*, 347 CFR Parts 2, 15, 68, and 73 (2023).

**(C) Related Cases**.

The ruling under review has not been, and is not, the subject of any other petition for review, aside from those actions that have been consolidated in this proceeding.

# TABLE OF CONTENTS

**CIRCUIT RULE 29(D) STATEMENT** ............................................................... ii

**CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW AND RELATED CASES** ................................................................ iii

**TABLE OF CONTENTS** ............................................................... iv

**TABLE OF AUTHORITIES** ............................................................... v

**GLOSSARY OF ABBREVIATIONS** ............................................... vii

**STATUTES AND REGULATIONS** ................................................. viii

**STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE** ............................................................... ix

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS** . xi

**INTRODUCTION** ............................................................... 1

**ARGUMENT** ............................................................... 2

**I.     FIRST AMENDMENT PRINCIPLES SHOULD INFORM THIS COURT'S ANALYSIS OF PETITIONER'S CLAIMS AND COMPEL THE CONCLUSION THAT PUBLIC ACCESS TO LAWS AND REGULATIONS IS REQUIRED.** ............................................................... 2

**II.    RESTRICTING ACCESS TO LAWS HARMS THE PUBLIC INTEREST.** ............................................................... 8

A.  Allowing Private Parties to Shield the Law from Public View Burdens Journalism ............................................................... 8

B.  Burdening Journalists' Access to Regulations (Including Standards Incorporated By Reference) Harms the Public. ................. 12

**CONCLUSION** ............................................................... 15

**CERTIFICATE OF COMPLIANCE** ............................................. 16

**CERTIFICATE OF SERVICE** ................................................... 17

# TABLE OF AUTHORITIES

## CASES

*Am. Society for Testing & Materials v. Public.Resource.Org, Inc.*,
   896 F.3d 437 (D.C. Cir. 2018)....................................................................12

*Courthouse News Serv. v. Schaefer*,
   2 F.4th 318 (4th Cir. 2021) .......................................................................4

*Globe Newspaper Co. v. Superior Court*,
   457 U.S. 596 (1982)..............................................................................3, 6

*Mills v. Alabama*,
   384 U.S. 214 (1966)..............................................................................3, 8

*N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012) .......................................................................4

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964).................................................................................1

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971).................................................................................6

*Press-Enterprise Co. v. Superior Court*,
   478 U.S. 1 (1986)..................................................................................4, 5

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980)........................................................................3, 4, 5, 7, 8

*Washington Post v. Robinson*,
   935 F.2d 282 (D.C. Cir. 1991) ....................................................................4

## STATUTES

5 U.S.C. § 552 ..........................................................................................9

5 U.S.C. § 553 ..........................................................................................9

E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899...............11

## OTHER AUTHORITIES

Alison G. Olson, *Eighteenth-Century Colonial Legislatures and Their
   Constituents*, 79 J. Am. Hist. 543 (1992)....................................................6

ANSI Webstore (last visited Mar. 24, 2024)...............................................10

Antonin Scalia, Essay, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.
   Rev. 1175 (1989) ....................................................................................10

Christina Jewett & Will Fitzgibbon, *Lead-Tainted Applesauce Sailed Through Gaps in Food-Safety System*, N.Y. Times (Feb. 27, 2024) .........12

H.R. Journal, 3d Cong., 2d Sess. 328–29 (1795) ..............................................6

Jeanna Smialek & Rob Copeland, *Bank Runs Spooked Regulators. Now a Clampdown Is Coming.*, N.Y. Times (Mar. 5, 2024) .................................13

Joel Rose, *The Transportation Department Proposes New Rules for How Airlines Handle Wheelchairs*, NPR (Feb. 29, 2024) .................................13

Michael Levenson, *Don't Laugh and Drive: U.S. Cracks Down on Funny Highway Warnings*, N.Y. Times (Jan. 18, 2024)......................................13

Nina A. Mendelson, *Private Control over Access to Public Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737 (2014) ..............................................................................6, 10, 11

Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Circular A-130, Management of Federal Information Resources (2000) ............................12

Pa. Packet and Daily Advertiser, Sept. 19, 1787............................................6

Reuters, *U.S. EPA Proposes Methane Emission Standards for Oil and Gas Industry*, Reuters (Aug. 18, 2015) ............................................................13

*Standards Incorporated by Reference (SIBR) Database*, Standards.gov (last visited Mar. 20, 2024).........................................................................10, 13

U.S. Government Publishing Office, *Free Document Dissemination Through the Federal Depository Library Program* (last visited Mar. 19, 2024).......7

vi

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ANSI | American National Standards Institute |
| CFR | Code of Federal Regulations |
| FCC | Federal Communications Commission |
| JA | Joint Appendix |

## STATUTES AND REGULATIONS

All applicable statutes, etc. are contained in the Brief for Petitioners

filed March 27, 2024.

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

*Amici curiae*, The New York Times Company and the Reporters Committee for Freedom of the Press (collectively, "*Amici*"), file this brief in support of Petitioners Public.Resource.Org, Inc., iFixit, Inc., and Make Community. Petitioners and Respondent Federal Communications Commission have all consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2); D.C. Cir. Rule 29(a)(2).

As representatives of the news media, *Amici* have a strong interest in ensuring the public availability of government documents, especially those that carry the force of law. This interest extends to materials that were initially drafted by private entities and subsequently incorporated by reference into statutes and regulations. Incorporated standards have been widely adopted throughout all levels of government as part and parcel of administrative regulations. Reporting on the regulatory state, then, requires reporting on incorporated standards. Access to the text of regulations and standards incorporated therein is essential to informing the vital work of reporters, and—thus—to educating members of the public about laws that govern their lives. *Amici* have an interest in government transparency and thus in opposing government actions that limit access to the law, including through efforts to restrict the public availability and accessibility of

ix

proposed and binding regulation, including those with incorporated

standards.

## STATEMENT OF AUTHORSHIP
## AND FINANCIAL CONTRIBUTIONS

*Amici* certify that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and no party or person—other than the *Amici*, or their counsel—contributed money that was intended to fund the preparation or submission of this brief.

# INTRODUCTION

This case implicates the fundamental First Amendment principle "that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Petitioners are Public.Resource.Org, Inc. ("Public Resource"), iFixit, Inc. ("iFixit"), and Make Community ("Make Community") (collectively, "Petitioners"). Public Resource is a non-profit public interest organization whose mission is to improve public access to the law. Public Resource acquires copies of legal decisions, tax filings, statutes, and regulations and makes them available online, free of charge. iFixit and Make Community represent fixers, repair-seekers, and translators dedicated to creating new and innovative devices that must conform to rules issued by Respondent Federal Communications Commission ("FCC" or "Respondent"). This case underscores the requirement that the rules and regulations promulgated by the FCC and other federal agencies be broadly accessible to the public.

From the moment a private standard is incorporated into an agency's regulation, the public is under an obligation to comply with it to the letter. Authorizing private institutions to maintain control over such standards—limiting access and charging exorbitant fees for access—makes it

1

unreasonably difficult for journalists and other members of the public to know what is required by law. This is an extraordinary and untenable result.

A ruling in favor of Petitioners would be consistent with both precedent and sound public policy; it would safeguard press and public access to the law and maintain the integrity of the lawmaking process. For these reasons, *amici curiae* The New York Times Company and the Reporters Committee for Freedom of the Press (collectively, "*Amici*") respectfully urge the Court to conclude that when an agency like the FCC promulgates rules that incorporate standards by reference, the agency must ensure that those standards are available and accessible to journalists and the public.

## ARGUMENT

### I. FIRST AMENDMENT PRINCIPLES SHOULD INFORM THIS COURT'S ANALYSIS OF PETITIONER'S CLAIMS AND COMPEL THE CONCLUSION THAT PUBLIC ACCESS TO LAWS AND REGULATIONS IS REQUIRED.

Our republic is premised on an informed public. A recognition that governance without understanding can lead to dire consequences has shaped interpretations of the First Amendment. Free speech principles protect not only expression by the public but also the public's access to information vital to self-rule. The Supreme Court has written that "a major purpose of [the First] Amendment [is] to protect the free discussion of governmental

affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). "By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982). Implicit in this commitment to robust public debate about civic issues is the assumption of an informed public, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 (1980) (Brennan, J., concurring), which depends, in large part, on the ability of the press to gather and convey information about the workings of government.

However, both the First Amendment's role in promoting informed public debate and the press's ability to report on governmental affairs is undermined when access to information is restricted in ways that have no legal basis. And this is especially consequential when—as here—the information being restricted is the laws that organize society. These principles that underlie the First Amendment should inform this Court's interpretation of the statutory access and disclosure requirements asserted by Petitioners, and counsel in favor of an interpretation that requires agencies like Respondent to make proposed and enacted regulations readily accessible to the press and public.

In this vein, courts have recognized a broad right of access under the First Amendment. For example, the Supreme Court has recognized a qualified First Amendment right of access to criminal proceedings. *See Richmond Newspapers*, 448 U.S. at 580 (upholding a qualified right of access to criminal trials); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10 (1986) (*Press-Enterprise II*) (upholding a qualified right of access to preliminary hearings). And federal courts of appeals, including this one, have recognized the applicability of that qualified constitutional right of access to judicial records and other types of government proceedings. *See, e.g., Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021) (First Amendment right of access to newly filed civil complaints); *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 290 (2d Cir. 2012) (First Amendment right of access to an administrative adjudicatory proceeding); *Washington Post v. Robinson*, 935 F.2d 282, 292 (D.C. Cir. 1991) (First Amendment right of access to plea agreements).

In determining whether a constitutional right of access applies, courts look to "two complementary considerations": logic and experience. *Press-Enterprise II*, 478 U.S. at 8. "Logic" refers to whether "public access plays a significant positive role in the functioning of the particular process in question," and "experience" to whether "the place and process have

4

historically been open to the press and the general public." *Id.* at 8–9. For instance, in the context of criminal proceedings, the Supreme Court considered the long history of open trials, referring often to the origins of English and early American trials. *Richmond Newspapers*, 448 U.S. at 567–69. As to the logic of public access, the Court stressed the crucial value of openness to ensuring the fairness of court proceedings, and to discouraging "perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Id.* at 569. Because of the press's "function[] as surrogates for the public," the benefits of this openness are enjoyed not only by those physically in the courtroom, but by society at large, as the Court identified. *Id.* at 573.

These structural values underlying the Court's decision in *Richmond Newspapers* are deeply relevant to the case at bar. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Id.* at 572. Along these lines, just as public access to courtrooms facilitates fair judicial proceedings, public access to incorporated standards facilitates fairness in the functioning of our government. Public dissemination of incorporated standards—which have the force of law—ensures those governed by such standards have adequate notice, makes them open to public assessment, and

provides an important check on the legislative and executive branches by restraining abuses of power. *Cf. Globe Newspaper Co.*, 457 U.S. at 606. By the same token, obscuring incorporated standards from public scrutiny undermines governmental legitimacy by inhibiting the press and public from observing lawmaking institutions. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 724 (1971) (Douglas, J., concurring) ("Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors.").

Public dissemination of binding laws and regulations enjoys a rich historical tradition. Beginning in the eighteenth century, legislators in colonial America codified and published their statutes in newspapers to allow for equal access to justice. Alison G. Olson, *Eighteenth-Century Colonial Legislatures and Their Constituents*, 79 J. Am. Hist. 543, 563–64 (1992). The Constitution itself was published in a newspaper two days after it was signed. Pa. Packet & Daily Advertiser, Sept. 19, 1787. And eventually, in 1795, Congress decided to look beyond newspapers, seeking to provide for "more general promulgation of the laws of the United States." Nina A. Mendelson, *Private Control over Access to Public Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 765 (2014) (citing H.R. Journal, 3d Cong., 2d Sess. 328–29 (1795)).

As mechanisms of public access have evolved, the government has

evolved with them to maximize the transparency of the law. This is reflected

in the accessibility of the U.S. Code and the Code of Federal Regulations

("CFR"), which are now available not only in the over 1,150 depository

libraries nationwide, but also online. U.S. Government Publishing Office,

*Free Document Dissemination Through the Federal Depository Library*

*Program*, https://www.gpo.gov/how-to-work-with-us/agency/services-for-

agencies/federal-depository-library-program (last visited Mar. 19, 2024).

Considered against the backdrop of this clear tradition of public access to the

law, the use of private, paywalled standards incorporated by reference into

federal regulations is a novel and inconsistent practice.

For people to discuss, debate, and act in accordance with the law, they

must know what the law requires, and they depend on the press to inform

them of the rules and regulations that govern society. The imposition of

exorbitant fees and other obstacles to access incorporated documents

undermines democratic self-governance. Denying the press and public

access to these documents is inconsistent with the First Amendment's aims

of "assuring freedom of communication on matters relating to the

functioning of government," *Richmond Newspapers,* 448 U.S. at 575,

"securing and fostering our republican system of self-government," and

informing "valuable public debate," *id.* at 587 (Brennan, J., concurring).
These core First Amendment commitments should inform this Court's
decision as to the FCC's obligations to ensure the accessibility and
transparency of its regulations, and the standards incorporated by reference
therein.

## II.   RESTRICTING ACCESS TO LAWS HARMS THE PUBLIC INTEREST.

### A. Allowing Private Parties to Shield the Law from Public View Burdens Journalism.

The press is a key conduit through which the public comes to
understand the laws that govern their lives. Journalists provide the public
with reliable, up-to-date information about public affairs, including,
crucially, government activities. They monitor legislative hearings,
scrutinize draft bills, comb through the Federal Register, interview
lawmakers, and disseminate information to the public about how proposed
and enacted legislation will affect people's everyday lives. *See Mills v.
Alabama*, 384 U.S. 214, 219 (1966) ("[T]he press serves and was designed
to serve as a powerful antidote to any abuses of power by governmental
officials and . . . for keeping officials elected by the people responsible to all
the people whom they were selected to serve."). Without access to the full
text of laws and regulations—including the materials they incorporate by

reference—journalists cannot keep the public informed. Access matters at the notice and comment stage of the rulemaking process, as reporting provides interested parties with the context and analysis to inform their own comments. Access matters after final rules are promulgated, too, by allowing the public to understand and comply with federal regulations. Indeed, the Administrative Procedure Act makes public access to rules a requirement at both stages. 5 U.S.C. § 553(b); 5 U.S.C. § 552(a)(1)(D). Because the regulation in question incorporates private standards by reference without ensuring those standards are broadly available or easily accessible to the public and press, it is, in effect, law hidden from public view.

    The FCC and the author of the standards to which Petitioners seek access—in this case, the American National Standards Institute ("ANSI")— counter by offering three methods for interested parties, including journalists, to view the incorporated standards, each of which the FCC contends provides sufficient public access. Joint Appendix ("JA") 3–6, ¶¶ 7– 11. First, the FCC asserts that the standards can be purchased directly from ANSI. *See* JA 5, ¶ 10. Second, the FCC points out that the standards are available for in-person inspection at government offices. *Id.* Third, the FCC notes that "at least two of [the] standards were available online in a read-

only format" provided by ANSI. *Id.* Each of these avenues is woefully
inadequate.

Access limited by cost, geography, and legal constraints frustrates the
principle "that those subject to the law must have the means of knowing
what it prescribes." Antonin Scalia, Essay, *The Rule of Law as a Law of
Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989). Purchasing the standards
incorporated by reference into 88 Fed. Reg. 67108 would cost a journalist or
news organization $589, JA 67, making access cost prohibitive for smaller
news outlets and independent, freelance journalists reporting on the effects
of the rule at issue here—let alone interested individuals. At scale, endorsing
this approach would make it exorbitantly expensive for any news
organization or individual to access the tens of thousands of incorporated
standards in the CFR. *Standards Incorporated by Reference (SIBR)
Database*, Standards.gov, https://sibr.nist.gov/ (last visited Mar. 20, 2024);
*see also* ANSI Webstore, https://webstore.ansi.org/ (last visited Mar. 24,
2024) (advertising "200,000 standards for individual sale"). Mechanisms
designed to provide accountability "cannot function adequately if large
numbers of people or entities with limited budgets face significant obstacles
to reading the law." Mendelson, *supra*, at 769.

Similarly, requiring that a journalist or member of the public visit a federal office in person to view an incorporated standard imposes practical obstacles that hinder access for persons without geographic proximity and/or the financial means to travel to those offices. Reliance on physical, in-person access is out of step with the digitization of the CFR and the Paperwork Reduction Act, which is intended to "us[e] information technology to increase access, accountability, and transparency" in federal rulemaking. E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2915-16. More broadly, exclusive physical access is an anachronism in the era of digital journalism, especially in a post-pandemic environment.

Finally, online reading rooms create additional concerning roadblocks to access by journalists and the public at large. "[T]he 'reading rooms' are not easy to locate . . . A reader must also waive any challenges to the copyright as a condition of getting to see the document." Mendelson, *supra*, at 753. Gaining entry to these privately-operated webpages requires users to furnish extensive biographical details, install cumbersome software, and consent to an End User License Agreement—an Agreement that allows for the storage of a single copy of the standards on one computer, subject to revocation, at any time, for any reason. JA 69–70. Worse, control is left entirely in the hands of private parties that may choose to alter the terms of

access or even render their standards wholly inaccessible to the public. *Id.*;

*see also Am. Society for Testing & Materials v. Public.Resource.Org, Inc.*,

896 F.3d 437, 458 (D.C. Cir. 2018) (Katsas, J., concurring) ("[A]ccess to the

law cannot be conditioned on the consent of a private party."). This

arrangement—where materials binding on the public are subject to private

control—raises the prospect that those private parties might simply terminate

access when journalists investigate or report unfavorably about the standards

that have become part of federal law.

**B. Burdening Journalists' Access to Regulations (Including Standards Incorporated By Reference) Harms the Public.**

   Press coverage about regulations and their effects improves the

responsiveness of government, builds trust between communities and

officials, and helps to realize the ideals of our republic. *See* Off. of Mgmt. &

Budget, Exec. Off. of the President, OMB Circular A-130, Management of

Federal Information Resources (2000) ("The free flow of information

between the government and the public is essential to a democratic

society.") Without access to the full text of government regulations,

journalists cannot do their jobs, and the public suffers the consequences.

   News coverage about federal regulations touches every part of

American life. *See, e.g.*, Christina Jewett & Will Fitzgibbon, *Lead-Tainted*

*Applesauce Sailed Through Gaps in Food-Safety System*, N.Y. Times (Feb.

27, 2024), https://perma.cc/J2BD-3CBQ (Food and Drug Administration

failing to identify tainted food supply that poisoned children); Jeanna

Smialek & Rob Copeland, *Bank Runs Spooked Regulators. Now a*

*Clampdown Is Coming.*, N.Y. Times (Mar. 5, 2024),

https://perma.cc/5WFM-NGZR (Federal Reserve proposing regulation to

avoid financial disasters); Joel Rose, *The Transportation Department*

*Proposes New Rules for How Airlines Handle Wheelchairs*, NPR (Feb. 29,

2024) https://perma.cc/9N88-BFMM (Department of Transportation

accommodating disabled passengers); Michael Levenson, *Don't Laugh and*

*Drive: U.S. Cracks Down on Funny Highway Warnings*, N.Y. Times (Jan.

18, 2024), https://perma.cc/M9QN-P84E (Federal Highway Administration

provides guidance related to automobile safety); Reuters, *U.S. EPA*

*Proposes Methane Emission Standards for Oil and Gas Industry*, Reuters

(Aug. 18, 2015) https://reut.rs/3PHOqJB (Environmental Protection Agency

proposes standards to reduce methane emissions). Regulations promote

safety on the roads and in the aisles of the supermarket. Regulations

determine the cleanliness of air and water. Regulations shape commercial

activity, access to education, and medical care. Journalism about federal

regulation is journalism about American public life.

The incorporation by reference of private standards plays a significant role in federal rulemaking. To date, the CFR contains more than 27,000 instances of incorporation by reference. *See Standards Incorporated by Reference*, *supra*. If journalists cannot reasonably access those materials incorporated by reference, they cannot adequately report the law to the public. It is not sufficient for journalists to rely on an agency's summary of the standards it is incorporating. To hold the government accountable, journalists must be able to verify that those summaries are accurate. That necessitates access to the standards themselves.

The position of federal agencies is that incorporation of private standards "conveys significant benefits." Emily S. Bremmer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J. L. & Pub. Pol'y 131, 139 (2013). A governmental approach that relies, in part, on private standards is not irreconcilable with public access to such standards. Indeed, the claimed benefits of private standards underscore the importance of access: agencies will continue to incorporate standards by reference because of the practical advantages of doing so and, increasingly, access to the law will be subject to control by private parties. *Amici* respectfully submit that such a result would be both dangerous and untenable.

14

## CONCLUSION

For the foregoing reasons, *Amici* respectfully urge the Court to hold that when an agency such as the FCC promulgates rules that incorporate by reference private standards, that agency must ensure access to those standards for journalists and the public.

Respectfully submitted,

Dated: April 3, 2024              /s/ Christopher T. Bavitz

Christopher T. Bavitz
Cyberlaw Clinic[1]
Harvard Law School
1557 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9125
cbavitz@law.harvard.edu

Counsel for *Amici Curiae*
Reporters Committee for Freedom of the
Press and The New York Times Company

---

[1] *Amici* thank spring 2024 Cyberlaw Clinic students James Atlas, Jeane Khang, Nilofar Vakili, and Alec Winshel, for their valuable contributions to this brief.

15

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the Circuit Rules. The document contains 2,890 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using Microsoft Word, in the font Times New Roman.

Dated: April 3, 2024            /s/ Christopher T. Bavitz

Christopher T. Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9125
cbavitz@law.harvard.edu

Counsel for *Amici Curiae*
Reporters Committee for Freedom of the Press and The New York Times Company

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2024, I caused the foregoing Brief of *Amici Curiae* The New York Times Company and the Reporters Committee for Freedom of the Press in Support of Petitioners to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

Dated: April 3, 2024    /s/ Christopher T. Bavitz

Christopher T. Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9125
cbavitz@law.harvard.edu

Counsel for *Amici Curiae*
Reporters Committee for Freedom of the
Press and The New York Times Company