No. 23-1311

---

IN THE
**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Public.Resource.Org, Inc., *et al.,*

*Petitioners,*

v.

Federal Communications Commission, *et al.,*

*Respondents.*

---

ON PETITION TO REVIEW AN ORDER
OF THE FEDERAL COMMUNICATIONS COMMISSION

---

**AMICUS BRIEF OF ACCESSIBILITY RESEARCH
AND ADVOCACY ORGANIZATIONS**

---

Vivek Krishnamurthy
SAMUELSON-GLUSHKO TECHNOLOGY LAW
AND POLICY CLINIC AT COLORADO LAW

Wolf Law Building | 404 UCB
2450 Kittredge Loop Dr.
Boulder, CO 80309–0404
303-492-0209
vivek.krishnamurthy@colorado.edu

*Counsel for amici curiae*

April 3, 2024

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1(a), amici curiae state that they have no parent corporations and that no publicly held entity owns ten percent (10%) or more of any amicus organization.

## Certificate as to Parties, Rulings Under Review, and Related Cases

**Parties and Amici.** Except for amici the American Foundation for the Blind, Prime Access Consulting, the New York Times Company, and the Reporters Committee for Freedom of the Press, all parties, intervenors, and amici appearing before this Court are listed in the Brief for the Petitioners filed on March 27, 2024.

**Ruling Under Review.** The only ruling below is the September 29, 2023, decision of the FCC which was published at 88 Fed. Reg. 67108-16. The ruling is reproduced at pages 1-35 of the Joint Appendix.

**Related Cases.** To the best of amici's knowledge, there are no related cases.

## Table of Contents

**Corporate Disclosure Statement** ..................................................2

**Certificate as to Parties, Rulings Under Review, and Related Cases** ...........3

**Table of Authorities** ..................................................5

**Glossary of Abbreviations** ..................................................8

**Statutes and Regulations** ..................................................9

**Statement of Identity, Interest in Case, and Source of Authority to File** ..10

**Statement of Authorship and Financial Contributions** ...............12

**Argument** ..................................................13

   1.   Electronic reading rooms providing access to standards incorporated by reference into federal regulations are inaccessible to Americans with many kinds of disabilities. ...........................................19

      1.1.   The inaccessible design of the ANSI incorporation by reference portal prevents Americans with a range of disabilities from accessing relevant standards through its electronic "reading room." ..................................................22

      1.2.   The electronic reading rooms maintained by ANSI and IEEE do not provide standards incorporated by reference into regulations in accessible formats. ..................................................25

   2.   Reliance by federal agencies on inaccessible reading rooms in their rulemaking activities violates the Rehabilitation Act. ......................27

      2.1.   Section 504 of the Rehabilitation Act prohibits administrative agencies from excluding Americans with disabilities from the rulemaking process. ..................................................27

      2.2.   Agency reliance on inaccessible electronic reading rooms in the rulemaking process also violates Section 508 of the Rehabilitation Act. ..................................................30

**Conclusion** ..................................................34

**Certificate of Compliance** ..................................................35

**Certificate of Service** ..................................................36

## Table of Authorities

### Cases

*Alexander v. Choate,* 469 U.S. 287 (1985) ..........................................................................18

*Am. Council of the Blind v. Paulson,* 525 F.3d 1256 (D.C. Cir. 2008) ...........................27

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc. (ASTM I),* 896 F.3d 437 (D.C. Cir. 2018) ..........................................................................................13, 14

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc. (ASTM II),* 82 F.4th 1262 (D.C. Cir. 2023) ..........................................................................................13, 17

*Americans Disabled for Accessible Pub. Transp. (ADAPT) v. Skinner,* 881 F.2d 1184 (3d Cir. 1989) ..............................................................................................................29

*Clark v. Vilsack,* No. CV 19-394 (JEB), 2021 WL 2156500 (D.D.C. May 27, 2021) ...30

*D'Amore v. Small Business Administration,* No. 21-CV-01505 (CRC), 21 WL 6753481 (D.D.C. Sept. 16, 2021) ..............................................................................30

*Dopico v. Goldschmidt,* 687 F.2d 644, 652 (2d Cir. 1982) ................................................33

*Nat'l Ass'n of the Deaf v. Netflix, Inc.,* 869 F. Supp. 2d 196 (D. Mass. 2012) ..............32

### Statutes

5 U.S.C. § 552 ..............................................................................................................13, 28

5 U.S.C. § 553 ..............................................................................................................28, 34

29 U.S.C. § 794 ..................................................................................................18, 27, 28

29 U.S.C. § 794d ..........................................................................................................30, 33

40 U.S.C. § 11101 ..............................................................................................................30

42 U.S.C. § 12182 ..............................................................................................................32

### Rules

1 C.F.R. § 51.7(3) .........................................................................................................28, 29

36 C.F.R. § 1194 ................................................................................................................20

Amend. of Part 1 of the Commission's Rules to Implement Section 504 of the
     Rehab. Act of 1973, 2 FCC Rcd. 2199 (1987) .................................................. 28

## Administrative Materials

Guidance on Web Accessibility and the ADA, U.S. Dep't of Just., Civ. Rts. Div.
     (Mar. 18, 2022), [https://perma.cc/K9JP-TMQJ]. ....................................... 20

Nondiscrimination on the Basis of Disability; Accessibility of Web Information
     and Services of State and Local Government Entities, 88 Fed. Reg. 51948
     (proposed Aug. 4, 2023) ............................................................................ 21, 32

U.S. Department of Justice, Section 508 Report to the President and Congress:
     Accessibility of Federal Electronic and Information Technology (Sept. 2012),
     [https://perma.cc/6HET-47NF]. ................................................................. 31

United States Access Board, Information and Communication Technology
     Guidelines: Revised 508 Standards and 255 Guidelines (Jan. 22, 2018),
     [https://perma.cc/KK77-TYRE]. ............................................................. 30, 31

## Other Authorities

124 Cong. Rec. 13,901 (1978) ............................................................................... 28

*American Community Survey*, U.S. Census Bureau, [https://perma.cc/Y6DJ-E2CD]
     ........................................................................................................................... 16

Brief for Prime Access Consulting as Amicus Curiae Supporting Appellee, *Am.
     Soc'y for Testing & Materials v. Public.Resource.Org, Inc. (ASTM II)*, 82 F.4th 1262
     (D.C. Cir. 2023) (No. 22-7063), [https://perma.cc/4P53-XRSJ] ................................. 17

Emily Bremer, *Incorporation by Reference in an Open-Government Age*, 36 HARV
     J.L. & PUB. POL'Y 131 (2013) .................................................................. 19

*How Disability Data are Collected from The American Community Survey*, U.S.
     Census Bureau, [https://perma.cc/CSH2-3V7G] ....................................... 16

*IBR Standards Hosted by ANSI*, Am. Nat'l Standards Inst.,
     [https://perma.cc/U9RW-AZTY]. ................................................................ 22

*IBR Standards Portal*, Am. Nat'l Standards Inst., [https://perma.cc/U9RW-AZTY] 22

*IEEE Standards Reading Room*, IEEE Xplore, [https://perma.cc/TM2W-S4GJ] ........ 23

Karin Müller et al., *Traveling More Independently: A Study on the Diverse Needs and Challenges of People with Visual or Mobility Impairments in Unfamiliar Indoor Environments*, 15 ACM Trans. Access. Comput. 1 (2022), https://doi.org/10.1145/3514255. ...................................................................... 15

*Refreshable Braille Displays*, Am. Found. for the Blind, [https://perma.cc/67PT-W2FL]. ......................................................................................................... 26

Sandy Wong, *Traveling with Blindness: A Qualitative Space-Time Approach to Understanding Visual Impairment and Urban Mobility*, 49 Health & Place 85 (2018), https://doi.org/10.1016/j.healthplace.2017.11.009 ........................................ 15

*Screen Readers*, Am. Found. for the Blind, [https://perma.cc/GFZ6-TKQ7] ............ 19

*Understanding SC 2.1.1: Keyboard (Level A)*, WCAG 2.1 Understanding Docs—World Wide Web Consortium (June 20, 2023), [https://perma.cc/3WH3-LVL7]. ............................................................................................................. 20

*Virginia*, U.S. Census Bureau, [https://perma.cc/2XUJ-KUSE]................................... 18

*Web Content Accessibility Guidelines (WCAG) 2.1*, W3C, [https://perma.cc/6Y4J-4JEY] ............................................................................................................ 20

### Glossary of Abbreviations

| Term | Abbreviation |
|------|-------------|
| AFB | American Federation for the Blind |
| ANSI | American National Standards Institute |
| APA | Administrative Procedure Act |
| CFR | Code of Federal Regulations |
| DOJ | United States Department of Justice |
| FCC | Federal Communications Commission |
| IEEE | Institute of Electrical and Electronics Engineers |
| OFR | Office of the Federal Register |
| PAC | Prime Access Consulting |
| SSO | Standard Setting Organization |
| WCAG | Web Content Accessibility Guidelines |

## Statutes and Regulations

Except for the provisions of the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, and of Title 40 of the U.S. Code contained in the addendum to this brief, all applicable statutes and regulations are reproduced in the petitioners' brief.

## Statement of Identity, Interest in Case, and Source of Authority to File

Amici are organizations dedicated to advancing and promoting accessibility for people with disabilities in every aspect of American life—including the activity of federal agencies in making and enforcing regulations.

Amicus **American Foundation for the Blind** ("AFB") is a non-profit organization dedicated to creating a world of no limits for people who are blind or have low vision. The AFB advocates for public policy to make schools, workplaces, and communities more accessible for over eight million Americans who are blind or have low vision, in addition to conducting research and public education into the challenges and opportunities facing such persons.

Amicus **Prime Access Consulting** ("PAC") is an organization dedicated to promulgating inclusive design and accessibility in technology, especially as it pertains to accessible websites and web content. Amicus works on fundamental problems facing disabled people, especially those who have no or low vision or any other print disability. As part of its mission, amicus aspires to safeguard the civil rights of people with disabilities under federal law. Sina Bahram, amicus's founder, is a recognized expert in computer science and accessibility and is blind.

Amici share an interest in ensuring that all Americans have an equal opportunity to access the law and to participate in rulemaking processes by federal agencies—including when, as here, standards developed by third parties are incorporated by reference into proposed and final rules. Unfortunately, as amici demonstrate in their brief and their appended technical report, the reliance

by federal agencies on inaccessible electronic reading rooms operated by or for the third-party developers of such standards burdens and sometimes deprives Americans with disabilities of their right to do so, in violation of the Rehabilitation Act. Correspondingly, the participation by amici in these proceedings is necessary to ensure that the rights of Americans with disabilities are respected whenever federal agencies seek to incorporate materials by reference into proposed and final rules.

All parties have consented to the filing of this brief. Pursuant to D.C. Cir. Rule 29(d), counsel to amici has coordinated with other amici supporting the petitioners to ensure that the arguments presented in this brief are novel and that a separate brief is necessary.

## Statement of Authorship and Financial Contributions

No counsel for a party authored this brief in whole or in part. No party, counsel to any party, or any person other than amici curiae contributed money to fund preparation or submission of this brief.

## ARGUMENT

Disability law must be considered when determining whether standards incorporated by reference into federal regulations are "reasonably available" as required by the Administrative Procedure Act ("APA").[1] When such standards are not as readily available to people with disabilities as to those without, both the reasonable availability requirement of administrative law and the non-discrimination provisions of federal disability law are violated.

Nearly 27,000 standards developed by private organizations have been incorporated by reference into the Code of Federal Regulations ("CFR").[2] When agencies seek to incorporate such standards into regulations they are developing, they typically do not reproduce them in the Federal Register in whole or in part.[3] Rather, as the Federal Communications Commission ("FCC") did in the rulemaking at issue in this case, they typically engage in one of the three following practices to discharge their statutory duty to ensure that materials incorporated by reference into regulations are "reasonably available."

---

1. Administrative Procedure Act, 5 U.S.C. § 552(a)(1)(E). The provision states, in relevant part, that:

   "matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register."

2. *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc. (ASTM II)*, 82 F.4th 1262, 1265 (D.C. Cir. 2023).

3. *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc. (ASTM I)*, 896 F.3d 437, 442 (D.C. Cir. 2018).

- First, they direct "interested persons" to incur the time and expense of traveling to Washington DC to "inspect" a copy of the incorporated by reference materials at their headquarters.[4]

- Second, they suggest that interested persons can buy the standards at issue directly from the standards-setting organizations ("SSOs") that have issued them, at the high prices that petitioners have outlined in their brief.[5]

- Third, they suggest that at least some of the standards can be viewed online via electronic "reading rooms"[6] operated by or for some of the SSOs that have developed standards that are being considered for incorporation by reference into a regulation.[7]

For all the reasons stated by petitioners in their brief, amici agree that neither the first nor the second practices meet the APA's reasonable availability requirement.[8] These points apply with special force to Americans who are blind or have low vision, in view of the challenges that such persons face in terms of

---

4.    J.A. 8-9.

5.    *Id.* The cost of purchasing electronic versions of the four standards at issue in this case is $589. *See Id.* at 65-66.

6.    *Id.* at 5.

7.    *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc. (ASTM I)*, 896 F.3d at 442.

8.    Pet'r's Br. 16 ("Reasonably available" cannot mean having to go to the FCC headquarters...").

visiting our nation's capital to "inspect" documents at the FCC's headquarters.[9] It also applies to purchases by such persons of their own electronic copies of standards being considered for incorporation by reference to participate in federal rulemakings. Indeed, the online store maintained by the American National Standards Institute ("ANSI"), from which the four standards at issue in this case can be purchased, is not accessible to Americans with a range of disabilities—including blindness and low vision—due to its failure to comply with numerous web design accessibility guidelines.[10]

Amici also agree with petitioners that the electronic "reading rooms" to which the FCC and other agencies direct "interested parties" seeking to access materials under consideration for incorporation by reference fail to satisfy the APA's reasonable availability requirement, in view of the limited functionality and onerous terms of use of such websites.[11]

Significant as the barriers are that ordinary Americans face in trying to access standards from such electronic "reading rooms," they pale in comparison to those faced by the more than eight million Americans who are blind or have

---

9. *See, e.g.*, Sandy Wong, *Traveling with Blindness: A Qualitative Space-Time Approach to Understanding Visual Impairment and Urban Mobility*, 49 Health & Place 85 (2018), https://doi.org/10.1016/j.healthplace.2017.11.009. *See also* Karin Müller et al., *Traveling More Independently: A Study on the Diverse Needs and Challenges of People with Visual or Mobility Impairments in Unfamiliar Indoor Environments*, 15 ACM Trans. Access. Comput. 1 (2022), https://doi.org/10.1145/3514255.

10. *See* Add. at REV-12-15.

11. Pet'r's Br. 11 ("Petitioners also detailed the inadequacies…").

serious difficulty seeing, even when wearing glasses.[12] As the appended report by amicus Prime Access Consulting ("PAC") demonstrates, these difficulties are so grave that many Americans with disabilities—including people who are blind or have low vision—are effectively barred from accessing standards on many such websites. Correspondingly, neither the FCC nor any other federal agency can rely on such websites in their current form to claim that materials under consideration for incorporation by reference meet the APA's requirement of reasonable availability.

This is not the first time that amicus PAC has highlighted to this Court the failure of the SSOs to follow basic accessibility standards in designing their electronic reading rooms. In *American Society for Testing & Materials v. Public.Resource.Org, Inc. (ASTM II),* which this Court decided last September, PAC submitted an amicus brief accompanied by a technical report that documented the significant accessibility problems with the electronic "reading rooms"

---

12. *American Community Survey*, U.S. Census Bureau, https://data.census.gov/table/ACSST1Y2022.S1810?q=S1810 [https://perma.cc/Y6DJ-E2CD] (the relevant census information can be found by navigating to the "DISABILITY TYPE BY DETAILED AGE" subsection, clicking the "WITH A VISION DIFFICULTY" caret to expand, and scrolling to the right to the "with a disability—estimate" column, to find a cell estimating that 8,181,582 Americans have a visual disability—which corresponds to 2.5% of the population. *See also How Disability Data are Collected from The American Community Survey*, U.S. Census Bureau, https://www.census.gov/topics/health/disability/guidance/data-collection-acs.html [https://perma.cc/CSH2-3V7G] (defining "vision difficulty").

maintained by ANSI on behalf of 12 leading SSOs.[13] Amici regret to inform the Court that ANSI has made no meaningful changes to improve the accessibility of its website in the sixteen months that have elapsed since the submission of PAC's amicus brief in *ASTM II.*[14] What is more, there are significant accessibility problems with reading rooms maintained by 10 other SSOs that render the standards housed thereon inaccessible to Americans who are blind or have low vision.[15] Correspondingly, the nearly one in forty Americans with a vision-related disability are being denied any meaningful opportunity to participate in federal rulemakings, and to know what the law is, when such materials are incorporated by reference into proposed or final rules.[16] As a share of the American population, this would be akin to excluding everyone who lives in Virginia from meaningfully participating in rulemakings or from accessing the law when incorporated by reference materials are in play.[17]

---

13.   Brief for Prime Access Consulting as Amicus Curiae Supporting Appellee, *Am. Soc'y for Testing & Materials v. Public.Resource.Org*, *Inc. (ASTM II),* 82 F.4th 1262 (D.C. Cir. 2023) (No. 22-7063), https://www.eff.org/document/amicus-brief-prime-access-consulting [https://perma.cc/4P53-XRSJ].

14.   *See* Add. at REV-4.

15.   This includes the reading room maintained by the Institute of Electrical and Electronics Engineers ("IEEE") that houses standards germane to the FCC rulemaking under review in this proceeding. *See* Add. At REV-3-4. *See also* the discussion *infra* in Sections 1.1 and 1.2.

16.   *Am. Soc'y for Testing & Materials v. Public.Resource.Org*, *Inc. (ASTM II),* 82 F.4th at 1265.

17.   The 2020 Census reports that Virginia's share of the overall U.S. population was 2.576%. *See Virginia*, U.S. Census Bureau,

The Rehabilitation Act provides that no individual can be excluded from participating in any federal program or activity based on a disability.[18] The Act also requires Americans with disabilities to be provided with *meaningful* access to federal government programs and activities, rather than just *theoretical* opportunities.

In *Alexander v. Choate,* the Supreme Court noted that discrimination against people with disabilities is "most often the product[] not of invidious animus, but rather thoughtlessness and indifference—of benign neglect."[19] Regardless of the cause, the ability of Americans who are blind or have low vision to participate in rulemakings is merely *theoretical* when standards that are being considered for incorporation by reference are made available to the public through inaccessible websites.

This case presents the Court with an opportunity to correct a systemic injustice that faces more than eight million Americans who are blind or have low vision who wish to participate in federal rulemakings, or who just want to know what the law requires of them. As amicus PAC's report demonstrates, there are significant accessibility problems not just with the portal and "reading rooms" maintained by ANSI on behalf of 12 SSOs, but with the independent reading rooms maintained by 10 other SSOs that serve the same function of making

---

https://data.census.gov/profile/Virginia?g=040XX00US51 [https://perma.cc/2XUJ-KUSE] (last visited Apr. 1, 2024).

18.  Rehabilitation Act, 29 U.S.C. § 794(a).

19.  *Alexander v. Choate,* 469 U.S. 287, 295 (1985).

incorporated by reference materials available to the public.[20] By interpreting the APA's reasonable availability requirement for materials incorporated by reference in the light of the Rehabilitation Act, and holding that persons with disabilities must have meaningful access to such materials for incorporation by reference to be lawful, this Court can ensure that blindness and low vision need not pose a barrier to the ability of Americans from all walks of life to participate in the key functions of the administrative state.[21]

1. **Electronic reading rooms providing access to standards incorporated by reference into federal regulations are inaccessible to Americans with many kinds of disabilities.**

People with disabilities rely on a host of assistive technologies to access electronic content. Individuals who are blind or are experiencing significant vision loss rely on screen readers and magnification technologies to access content.[22] Individuals with a range of disabilities, from vision loss to manual dexterity disabilities, rely on keyboards, switches, and voice commands to navigate through on-screen content, instead of mouse and pointer-based

---

20. *See* Add. at REV-3-4.

21. *See* Emily Bremer, *Incorporation by Reference in an Open-Government Age*, 36 HARV J.L. & PUB. POL'Y 131, 157 (2013).

22. A screen reader is a software program which allows blind or low vision people to read text displayed on a computer screen. *Screen Readers*, Am. Found. for the Blind, https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers [https://perma.cc/GFZ6-TKQ7] (last visited Apr. 1, 2024).

commands.[23] Individuals who have low vision rely on adequate color contrast to distinguish objects on a screen, while individuals with color blindness rely on appropriate programming techniques to identify design elements that might otherwise be distinguished using color.[24]

The ability of Americans with a range of disabilities to use these and other access technologies depends on providers of electronic media adhering to a set of accessibility standards in developing their online content.[25] The freely available Web Content Accessibility Guidelines ("WCAG") is the leading set of standards in this space.[26] Developed by the World Wide Web Consortium ("W3C"), the WCAG has been incorporated by reference into federal regulations enacted by the Architectural and Transportation Barriers Compliance Board (the "Access Board") pursuant to the Rehabilitation Act.[27] Exercising its authority under Title II of the Americans with Disabilities Act, in August the Department of Justice proposed

---

23. *Understanding SC 2.1.1: Keyboard (Level A),* WCAG 2.1 Understanding Docs— World Wide Web Consortium (June 20, 2023), https://www.w3.org/WAI/WCAG21/Understanding/keyboard.html [https://perma.cc/3WH3-LVL7].

24. Add. at REV-3.

25. *See* Guidance on Web Accessibility and the ADA, U.S. Dep't of Just., Civ. Rts. Div. (Mar. 18, 2022), https://www.ada.gov/resources/web-guidance/ [https://perma.cc/K9JP-TMQJ].

26. *Web Content Accessibility Guidelines (WCAG) 2.1,* World Wide Web Consortium (Sept. 21, 2023), https://www.w3.org/TR/WCAG21/ [https://perma.cc/6Y4J-4JEY].

27. *See* Information and Communication Technology (ICT) Standards and Guidelines, 36 C.F.R. § 1194.

incorporating the WCAG by reference into website and mobile application accessibility rules that would apply to state and local governments.[28]

The irony of self-proclaimed standards-setting organizations failing to adhere to basic accessibility standards in designing their electronic "reading rooms" is not lost on amici. However, as the appended technical report prepared by amicus Prime Access Consulting ("PAC") details, these failures to adhere to accessibility standards render the reading rooms virtually inaccessible to Americans who are blind or have low vision.

The PAC report evaluates the compliance of the ANSI portal and associated "reading rooms" (which house incorporated by reference standards published by 12 SSOs), as well as the accessibility of separate reading rooms maintained by 10 other SSOs, with the WCAG. The report is not a formal accessibility audit, and it is not intended to provide an exhaustive overview of the accessibility problems with these websites.[29] Even so, its findings relating to the accessibility failures of such websites are sobering.

For each of the 11 websites evaluated, the PAC report begins with a "user journey" section, which details the steps that users must take to find, read, and (optionally) purchase a standard of interest on a given website.[30] The PAC report

---

28. *See* Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities, 88 Fed. Reg. 51948 (proposed Aug. 4, 2023) (to be codified at 28 C.F.R. § 35).

29. Add. at REV-3.

30. *See, e.g,* Add. at REV-6 ("user journey" for the ANSI portal); *see also* Add. at REV-54 ("user journey" for the IEEE incorporation by reference website).

details each accessibility problem that was found on these websites, provides a citation to the relevant WCAG criterion that the website has "failed," and then explains the "user impact" of these failures on individuals with a range of disabilities who rely on access technologies to interact with electronic content. The PAC report concludes with a list of all the WCAG criteria that are referenced in the report and a brief description of each.

**1.1.  The inaccessible design of the ANSI incorporation by reference portal prevents Americans with a range of disabilities from accessing relevant standards through its electronic "reading room."**

The American National Standards Institute ("ANSI") hosts an online portal which acts as a "one-stop mechanism for access to standards that have been incorporated by reference in the U.S. Code of Federal Regulations."[31] The ANSI portal uses the same underlying technology to furnish electronic "reading rooms" that provide access to standards developed by 12 SSOs that have been incorporated by reference into the CFR (or which are being considered for such incorporation).[32] The ANSI portal also provides links to 16 independent websites

---

31.  *IBR Standards Portal*, Am. Nat'l Standards Inst., https://ibr.ansi.org/Default.aspx [https://perma.cc/U9RW-AZTY] (last visited Apr. 1, 2024).

32.  Standards created by the IEC and the ISO can be accessed directly through the ANSI portal. *See IBR Standards Hosted by ANSI*, Am. Nat'l Standards Inst., https://ibr.ansi.org/Standards/Default.aspx#hosted-ansi [https://perma.cc/U9RW-AZTY] (last visited Apr. 1, 2024). The ANSI portal would be used to access ANSI-operated reading rooms that provide "access" to two of the four standards implicated in this case, namely, ISO/IEC 17011:2017 and ISO/IEC 17025:2017.

maintained by other SSOs—including the Institute of Electrical and Electronics Engineers ("IEEE")—that perform the same functions.[33]

The ANSI portal organizes standards that are being considered for incorporation by reference, or that have already been incorporated into regulations, into separate "reading rooms" based on the issuing SSO. To access a standard of interest hosted by ANSI on behalf of one of 12 participating SSOs, a visitor must follow a five-step user journey.[34] The first step is to navigate to the ANSI portal, the second step is to find links that lead to various reading rooms, and the third is to select a reading room in the "Hosted by ANSI" section of the portal.[35] The fourth step is for the user to complete a registration form, and the fifth is to navigate to and finally open the standard that the user is seeking to access.[36]

Unfortunately, ANSI's failure to respect the WCAG in the design of its portal and its reading rooms stymies people with disabilities who rely on access technologies at each step. The reliance of the ANSI portal on visual markers (such

---

33.  For example, the ANSI portal provides a link to reading rooms offered directly by IEEE. *See IEEE Standards Reading Room*, IEEE Xplore, https://ieeexplore.ieee.org/browse/standards/reading-room/page?pageNumber=2 [https://perma.cc/TM2W-S4GJ] (last visited Apr. 1, 2024). A separate reading room operated by IEEE would be used to "access" the remaining two standards that are relevant in this case: IEEE/ANSI C63.14.1-2018 and IEEE/ANSI C63.10.

34.  Add. at REV-6.

35.  *Id.*

36.  *Id.* An optional sixth step is to purchase the standard on the ANSI webstore. *See id.*

as logos and visual-only headings), rather than accessible design features (such as through the use of semantic mark-up that is legible to a screen reader), makes it difficult for people who are blind or have low vision to navigate the ANSI portal.[37]

Should persons with disabilities overcome these obstacles at the first and second stages of their user journey, they are thwarted at the third by ANSI's failure to list the standards available in each SSO's reading room in an accessible format. As amicus PAC's report details, ANSI's failure to include "focus indicators" on links, and its use of color alone to indicate the presence of hyperlinks, frustrates the ability of individuals using an array of access technologies to find the standard they are looking for.[38]

If a user with a disability makes it to the fourth stage of their user journey, they face additional accessibility barriers. Visitors to reading rooms provided by ANSI (on behalf of 12 SSOs) and IEEE (for its own standards) must register to access standards housed therein, yet as the PAC report details, the registration interfaces on reading rooms provided by ASNI and the IEEE are incompatible with many access technologies. For example, messages that alert users of the ANSI portal to data entry errors are not provided in an accessible format,[39] while

---

37.  *Id.* at REV-6-7.

38.  *Id.* at REV-7-8.

39.  *Id.* at REV-9.

the IEEE's registration interface is not legible to screen readers and other access technologies.[40]

Taken together, these accessibility flaws with the ANSI and IEEE portals and reading rooms make it difficult, if not impossible, for Americans with a range of disabilities to access the standards that the FCC sought to incorporate by reference in the rulemaking at issue in this case.

**1.2. The electronic reading rooms maintained by ANSI and IEEE do not provide standards incorporated by reference into regulations in accessible formats.**

Americans with disabilities who succeed in running the gauntlet of the websites described above are confronted with further accessibility barriers that prevent them from reading the text of standards that SSOs have made available on the ANSI and IEEE reading rooms.

A visitor to ANSI's reading rooms must download specialized, non-standard software to read the standards hosted thereon, yet the ANSI portal does not provide clear instructions on how to open this software once downloaded.[41] This leads users to be presented with error messages rather than the text of the standard they are trying to read.[42] Should a user manage to overcome these obstacles, the files which contain the text of the standards do not meet basic accessibility standards—such as "tagging" the content to ensure compatibility

---

40. *Id.* at REV-55-57.

41. *Id.* at REV-10-11.

42. *Id.* at REV-10.

with screen readers and refreshable braille devices,[43] and including "alternate text" that describes the content of images, tables, and figures for the benefit of Americans who rely on access technologies.[44] Indeed, some standards that are made available on the ANSI reading rooms consist of scanned images that can't be read using a screen reader.[45]

The IEEE's reading room fares even worse on these basic accessibility metrics. Its reading rooms contain inaccessible links and buttons,[46] and worst of all, the standards hosted through its reading *room are completely incompatible with screen readers.[47]* Whether this design choice reflects invidious animus or benign neglect on the part of the IEEE is not for amici to speculate, but what is clear is that the standards hosted on the IEEE's reading room are *de facto* inaccessible to Americans who are blind or have low vision.

---

43. Refreshable braille displays provide access to information on a computer screen by electronically raising and lowering different combinations of pins to output the on-screen content in braille. See *Refreshable braille displays*, Am. Found. for the Blind, https://www.afb.org/node/16207/refreshable-braille-displays [https://perma.cc/67PT-W2FL] (last visited Apr. 1, 2024).

44. Add. at REV-11-12.

45. *Id.* at REV-11-12.

46. *Id.* at REV-54-55.

47. *Id.* at REV-57-58.

2.  **Reliance by federal agencies on inaccessible reading rooms in their rulemaking activities violates the Rehabilitation Act.**

The reliance of the FCC and of so many other federal agencies on inaccessible electronic "reading rooms" to meet their statutory duty to ensure that incorporated by reference materials are "reasonably available" violates Sections 504 and 508 of the Rehabilitation Act of 1973. Not only does the inaccessible nature of these reading rooms exclude Americans with a range of disabilities from the opportunity to participate in federal rulemakings, but it denies them of access and use of incorporated by reference materials comparable to what Americans without such disabilities enjoy.

## 2.1. Section 504 of the Rehabilitation Act prohibits administrative agencies from excluding Americans with disabilities from the rulemaking process.

This Court has recognized that Congress enacted the Rehabilitation Act in 1973 "to ensure that members of the disabled community could live independently and fully participate in society."[48] Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination […] under any program or activity conducted by any Executive agency or by the United States Postal Service.[49]

Section 504 applies to "any program or activity" conducted by a federal agency. Creating rules pursuant to statutory authorities is the *raison d'être* of federal

---

48.  *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1259 (D.C. Cir. 2008).
49.  Rehabilitation Act, 29 U.S.C. § 794(a).

administrative agencies, hence Section 504 applies to these activities. Correspondingly, federal agencies must ensure that Americans are not excluded from participating in rulemakings by virtue of having a disability.[50]

Electronic "reading rooms" provided by SSOs are an essential part of rulemakings whenever administrative agencies rely upon them to satisfy the APA's reasonable availability requirement for incorporated by reference materials. As a default, the APA requires federal agencies to publish their proposed and final rules in the Federal Register or otherwise make them publicly available.[51] Pursuant to its authority under 5 U.S.C. § 552(a)(1), however, the Office of the Federal Register ("OFR") has promulgated rules permitting agencies that incorporate by reference materials into regulations to avoid publishing such materials in their entirety in the Federal Register—so long as the materials are "reasonably available to and usable by the class of persons affected."[52] In determining whether incorporated by reference materials meet this regulatory

---

50. The Rehabilitation Act applies to all independent federal agencies. Although Section 504 specifically refers to "Executive agenc[ies]," 29 U.S.C. § 794(a), the provision's legislative history indicates that its drafters intended for it to apply to independent agencies. *See* 124 Cong. Rec. 13,901 (1978) (remarks of Rep. Jeffords, the sponsor). In any case, the FCC has conceded the applicability of the Rehabilitation Act to its activities through its promulgation of rules to implement Section 504. *See* Amend. of Part 1 of the Commission's Rules to Implement Section 504 of the Rehab. Act of 1973, 2 FCC Rcd. 2199, 2199 & n.4 (1987) ("Congress intended [...] amendments [to Section 504] to apply to all federal agencies, including independent regulatory agencies like the [Federal Communications Commission]").

51. *See* 5 U.S.C. §§ 553(b), 552(a)(1)(D).

52. These rules are codified at 1 C.F.R. § 51.7(3).

requirement, the Director of the OFR will consider "[t]he completeness and *ease of handling* of the publication" which the agency seeks to incorporate by reference into its regulation, among other factors (emphasis added).[53]

For all the reasons explained in Part 1, Americans who are blind or have low vision experience no "ease" when it comes to accessing or handling incorporated by reference materials that are made available through the SSOs' inaccessible electronic reading rooms. Correspondingly, the reliance of federal agencies on such reading rooms in their rulemakings—as the FCC did here—violates Section 504 by discriminating against Americans with a range of disabilities by burdening their participation in such proceedings.

The Third Circuit underlined the importance of Section 504 in describing it as "the civil rights bill of the disabled."[54] Just as every other step of the rulemaking process—from the publication of notices in the Federal Register to the rooms in which administrative agencies hold hearings—is subject to Section 504, so too should this important civil rights provision apply to the use by federal agencies of electronic reading rooms provided by SSOs when they form an integral part of the rulemaking process.

---

53.   1 C.F.R. § 51.7(3)(i).

54.   *Ams. Disabled for Accessible Pub. Transp. (ADAPT) v. Skinner,* 881 F.2d 1184, 1187 (3d Cir. 1989).

## 2.2. Agency reliance on inaccessible electronic reading rooms in the rulemaking process also violates Section 508 of the Rehabilitation Act.

Section 508 of the Rehabilitation Act requires federal departments and agencies to provide individuals with disabilities with "access to and use of information and data that is comparable to" what is enjoyed by "members of the public who are not individuals with disabilities."[55] The provision tasks the Access Board with issuing and publishing standards setting forth "the technical and functional performance criteria necessary to implement [these] requirements."[56]

Section 508's accessibility mandate applies to electronic documents developed, procured, maintained, or *used* by federal agencies.[57] Although the reading rooms at issue in this case are developed and maintained by SSOs, their *use* by federal agencies in the rulemaking process subjects them to Section 508.

---

55. Rehabilitation Act, 29 U.S.C. § 794d(a)(1)(A)(ii). Section 508 applies to both executive agencies and to independent agencies. *See Clark v. Vilsack*, No. CV 19-394 (JEB), 2021 WL 2156500, at *1 (D.D.C. May 27, 2021) (noting Section 508's application to the United States Department of Agriculture, an executive agency); *D'Amore v. Small Business Administration*, No. 21-CV-01505 (CRC), 21 WL 6753481 (D.D.C. Sept. 16, 2021) (applying Section 508 to the Small Business Administration, an independent agency).

56. Rehabilitation Act, 29 U.S.C. § 794d(a)(2)(A)(ii).

57. *See* 40 U.S.C. § 11101 (defining "information technology). *See also* United States Access Board, Information and Communication Technology Guidelines: Revised 508 Standards and 255 Guidelines (Jan. 22, 2018) [https://perma.cc/KK77-TYRE] ("Section 508 requires access to ICT developed, procured, maintained, or used by federal agencies. Examples include computers, telecommunications equipment, multifunction office machines such as copiers that also operate as printers, software, websites, information kiosks and transaction machines, and electronic documents.") (last visited Apr. 1, 2024).

To hold otherwise would permit federal agencies to shirk their obligations under the Rehabilitation Act by incorporating inaccessible materials by reference, when documents produced by the agency of its own accord must be accessible.

It is not enough for Americans with disabilities—including people who are blind or have low vision—to have *theoretical* access to a standard incorporated by reference into a rulemaking. Access Board guidelines require agencies to provide persons with disabilities with *actual* access to electronic information that is *comparable* to what individuals without disabilities enjoy.[58] Notably, the Access Board requires operators of federal websites to "[p]provide text alternatives for any non-text content so that it can be changed into other forms people need," "[m]ake all functionality available from a keyboard," "[p]rovide ways to help users navigate, find content, and determine where they are," and "[m]ake text content readable and understandable."[59] These requirements align with the Department of Justice's ("DOJ") views on Section 508,[60] and with a recently

---

58. *See id* at §§ E205.4 & 702.10.1 (incorporating by reference *Web Content Accessibility Guidelines 2.0*, W3C, https://www.w3.org/TR/WCAG20/ (requiring that authors take affirmative steps to ensure that their web content meets certain accessibility guidelines and success criteria)).

59. *Id.*

60. A 2012 Department of Justice Report interprets Section 508 as requiring, among other things: appropriate use of color with proper contrast; "a well-defined on-screen indication of the current focus that moves with keyboard navigation"; alternate text and descriptive narration for multimedia content; and use of proper headers, both on web pages and tables. U.S. Department of Justice, Section 508 Report to the President and Congress: Accessibility of Federal Electronic and Information Technology (Sept. 2012), https://archive.ada.gov/508/508_Report.htm [https://perma.cc/6HET-47NF].

proposed rule by the DOJ that outlines web content and mobile app accessibility for state and local governments under the Americans with Disabilities Act.[61]

Unfortunately, these requirements are observed in the breach when it comes to the reading rooms operated by the SSOs. For all the reasons detailed in Part 1, the ANSI and IEEE reading rooms often fail to provide Americans who are blind or have low vision with any access to incorporated by reference materials, let alone *comparable access* to what able-bodied Americans enjoy. The failure of organizations that are committed to the development and adoption of standards to adhere with basic accessibility standards is deeply problematic and likely violates the Americans with Disabilities Act in its own right.[62] When federal agencies rely on such inaccessible websites in their rulemaking activities, however, Section 508 is undoubtedly violated.

---

It also notes that Section 508 requires that programmatic elements must provide sufficient information to assistive technology, such as screen readers. *Id.*

61.  *See* Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities, 88 Fed. Reg. 51948 (proposed Aug. 4, 2023) (to be codified at 28 C.F.R. § 35).

62.  The SSOs' electronic reading rooms are likely places of public accommodation subject to Title III of the Americans with Disabilities Act, which prohibits constructing a public accommodation in a way that "subjects an individual or class of individuals on the basis of a disability [...] directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity [...] to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i). *See, e.g., Nat'l Ass'n of the Deaf v. Netflix, Inc.,* 869 F. Supp. 2d 196, 200-01 (D. Mass. 2012) (holding that websites can be places of public accommodation subject to Title III).

While Section 508 provides an exception to the comparable access standard when "an undue burden would be imposed on the department or agency," nothing here suggests that the FCC or the SSOs would face undue burdens in making electronic reading rooms accessible to Americans with a range of disabilities. And even if the burdens of accessibility were undue, Section 508 still requires federal departments and agencies to provide "the information and data involved by an alternative means of access" that allows persons with disabilities "to use the information and data."[63]

In its explanation of its final rule, the FCC stated that no one who participated in the notice-and-comment process "identified any impediments to finding and accessing the standards under consideration."[64] This statement fundamentally misapprehends what the Rehabilitation Act requires of federal agencies. Persons with disabilities should not be required to file comments with the FCC explaining the problems they faced in obtaining access to incorporated by reference materials, nor are persons with disabilities required by law to ask an agency for an accessible copy of administrative materials so that they can exercise their rights of participation. In the words of the Second Circuit, "it is not enough to open the door for the handicapped (sic.); a ramp must be built so the door can be reached."[65] Correspondingly, Sections 504 and 508 behoove federal agencies to make administrative materials—including incorporated by reference

---

63.   Rehabilitation Act, 29 U.S.C. § 794d(a)(1)(B).

64.   J.A. at 23, ¶ 4.

65.   *Dopico v. Goldschmidt*, 687 F.2d 644, 652 (2d Cir. 1982).

materials—accessible to all Americans from the get-go to ensure that every interested person has a fair and equal opportunity to participate in rulemaking procedures.

## Conclusion

Amici urge this court to grant the relief sought by petitioners and to remand this case for further proceedings in compliance with 5 U.S.C. §§ 552(a)(1)(D) and 553(b), as well as all other applicable federal laws—including the Rehabilitation Act and regulations enacted pursuant to its authority.

*Respectfully submitted,*

/s/ *Vivek Krishnamurthy*

Vivek Krishnamurthy
Samuelson-Glushko Technology Law
and Policy Clinic at Colorado Law

Wolf Law Building | 404 UCB
2450 Kittredge Loop Dr.
Boulder, CO 80309–0404
303-492-0209
vivek.krishnamurthy@colorado.edu

*Counsel for amici curiae*

April 3, 2024

## Certificate of Compliance

This document complies with Federal Rule of Appellate Procedure 32(g)'s type-volume limitation. In compliance with Rule 32(a)(7)(B), it contains 5775 words, excluding the parts exempted by Rule 32(f) and Circuit Rule 32(e)(1). It has been typeset in a proportionally spaced typeface (14-point Linux Libertine) using Microsoft Word for Mac version 16.83 (24031120).

/s/ *Vivek Krishnamurthy*

Vivek Krishnamurthy
Samuelson-Glushko Technology Law
and Policy Clinic at Colorado Law

Wolf Law Building | 404 UCB
2450 Kittredge Loop Dr.
Boulder, CO 80309–0404
303-492-0209
vivek.krishnamurthy@colorado.edu

*Counsel for amici curiae*

April 3, 2024

## Certificate of Service

I certify that this brief was filed using the Court's CM/ECF system on April 3, 2024. All participants in the case are registered CM/ECF users and will be served electronically via that system. Paper copies of this brief will also be filed with the Clerk of this Court as the Clerk requests.

<u>/s/ *Vivek Krishnamurthy*</u>

Vivek Krishnamurthy
Samuelson-Glushko Technology Law
and Policy Clinic at Colorado Law

Wolf Law Building | 404 UCB
2450 Kittredge Loop Dr.
Boulder, CO 80309–0404
303-492-0209
vivek.krishnamurthy@colorado.edu

*Counsel for amici curiae*